19]          AUGUST TERM, 1920.          363

Att'y Gen. ex rel. Becker v. Bay Boom W. R. & F. Co. 172 Wis. 363.

ATTORNEY GENERAL EX REL. BECKER and others, Appel-
    lants, vs. BAY BOOM WILD RICE & FUR COMPANY and
    another, Respondents.

*June 2—October 19, 1920.*

*Navigable waters: Floating bogs: Land submerged by construction
    of dam: Navigability for twenty years: Impairment by dikes
    and drainage systems: Riparian rights: Permit to erect dike
    issued by United States: Avulsion.*

1. A "floating bog" is a mass of grass, reeds, and other aquatic
   vegetation growing and floating on the water, which may be-
   come frozen into the ice in winter, and in high water is car-
   ried on the surface and broken off and may be moved by
   winds and currents to deep water where it disappears as sedi-
   ment; and its formation in the summer season indicates a
   substantial amount of water between it and the soil forming
   the bed of the water.
2. A meandered lake, in fact navigable for over twenty years by
   boats and small water-craft and resorted to by the public for
   fishing and hunting in boats except when prevented by ice in
   winter or low water in droughty summer seasons, is navi-
   gable water, and the public cannot be enjoined from hunting
   or fishing thereon; and it is immaterial whether the waters
   were originally navigable or were made so by artificial
   agencies.
3. Land which became submerged by a dam raising the waters of
   a lake became an extension of the lake, title to the land being
   in the state, and the public has the right to enjoy the ease-
   ments of navigation.
4. "Avulsion" is a sudden disruption of a piece of ground from
   one man's land which is carried to another's and which may
   be followed and identified, as distinguished from that incre-
   ment which slowly or rapidly results from floods but which
   is utterly beyond the power of identification, and particularly
   from "gradual and imperceptible accretion."
5. Where a considerable part of the expanse inclosed by a dike
   was navigable water for twenty years or more before such in-
   closure, neither the defendants nor their predecessors in title
   had a legal right to destroy or impair the public easement
   therein through the establishment or operation of a drainage
   system, under sub. (1), (2), sec. 30.01, Stats.
6. A riparian owner's rights to construct embankments are
   limited, and he may, where necessary to protect his banks

against navigable waters, at his peril both of obstructing the public use and as to the necessity, intrude only as far as necessary in such waters; and any other extension upon the bed of such waters is wrongful and vests no right or title in him to continue the same.

7. A federal permit to construct a dike expressly declaring that it granted no property rights or exclusive privileges and that the free public use of the area inclosed was not to be prevented, is construed, in the light of the conditions upon which it was granted, not to vest defendants with the right to continue a dike which encroached upon and injured the enjoyment of the public easements of navigation, fishing, and hunting.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

This action was brought to prevent the construction and maintenance and to secure the removal of an earth embankment built within the water of Lake Poygan, a meandered body of water in Winnebago county, Wisconsin. The premises involved are situated in the angle formed by the junction of the so-called "Government Boom Cut" with the Wolf river in town 20 north, of range 14 east, and the particular inquiry relates to the five or six hundred acres partially inclosed by the embankment or dike constructed by the defendant corporation approximately upon the line designated in a permit issued for such purpose by the federal War Department upon the defendant's application before this action was brought.

The complaint alleges, in substance, that Lake Poygan is a meandered and navigable lake situated in Winnebago county, and that in the north section of the land here involved adjacent to the so-called cut-off is situated Boom Bay, which is an expansion of open water of about the width of one-half mile, and that immediately bordering upon this open water on the west and north is situated a marsh area containing six or seven hundred acres of land covered by water, in which wild rice and wild celery flourish, and that this area during the hunting season, at

the ordinary stages of water in the Wolf river and in this lake, is covered by water at a depth of from two to four feet and is navigable for fishing boats, skiffs, and canoes, and is part and parcel of the navigable waters of the state of Wisconsin; that the plaintiffs and others similarly situated have used this marsh for hunting and that it has been used in this way since the admission of the state to the Union and should continue to be so used; that commencing in April, 1916, and continuing up to the present time, the defendant has been engaged in constructing a large dike or embankment in the navigable waters of this lake; that defendant has contracted with *Martin Neumann* to construct this dike; and that the structure is a public nuisance and should be removed.

The answer admits that the lake is meandered and navigable and that the location has been used for many years by the public for hunting and fishing; denies inclosing navigable waters or excluding the public; alleges damage to defendant's lands by high water washing the same away; alleges the formation of a drainage district to inclose this area by the grantors of title to the defendant, for drainage, reclamation, and improvement; alleges that the dike is lawful, is within the original meander lines, is authorized by the drainage proceedings, is not a nuisance, and is lawful to protect, save, and reclaim its lands within the embankments

The case was tried before the court. Among the findings of the court were the following: That the defendant corporation uses these lands as a hunting preserve for ducks and for a farm or breeding place for fur-bearing animals; that these lands were granted to Wisconsin under the swamp land act of Congress and were conveyed by the state to the predecessors in title and grantors of the defendant corporation as "lands" and not "lake," and that they were *"lands" in fact,* although *"swamp lands;"* that when the United States government dam was built at Menasha it raised the level of the water in Lake Winnebago, in the Fox river,

and in Lake Poygan so that these lands were seriously injured by high water; that the injury to the lands became more serious after the illegal placing of flush-boards in this dam in the year 1900 and their maintenance there for some five or six years thereafter; that much of the marsh lands belonging to the defendant and its grantors and predecessors were from time to time torn away and lost; that in the way above mentioned most of the land between Wolf river, Bay Boom cut on the west and north, and Lake Poygan on the east and south, outside of the limits of the dike or embankment constructed by defendants, had been denuded of its surface soil to a large extent prior to 1905; that from 1900 to 1905 flush-boards on the dam at Menasha were illegally maintained; that these flush-boards raised the water in Lake Poygan approximately eight inches, causing great damage to the land now owned by the defendant corporation; that up to sixteen or eighteen years ago it was possible, in the ordinary stages of water, to walk all over defendant corporation's lands, which are now embraced within the confines of the dike, except only for two or three duck holes a few square rods in extent; that a boat could not be operated at this time on any parts of the lands now inclosed by the dike excepting the two or three small duck holes above mentioned; that the dike or embankment complained of is built wholly upon the lands of the defendant corporation, and that the water on either side of this dike in ordinary times now varies from a few inches in depth to within one or two feet at some points, and is not now and never was navigable in fact for anything except canoes and light-draft rowboats, and, so far as appears, was never navigated by any one except hunters and trappers.

The court further found that the grantors of the defendant corporation, Heuer and Sherman, procured a drainage district to be formed under the state laws for the purpose of authorizing the work of reclaiming and perfecting these lands; that they also obtained a permit from the

United States, through the secretary of war, for the erection and maintenance of the dike or embankment complained of; that the dike has been built in substantial compliance with the plans adopted by the drainage district and in substantial compliance with the permit from the United States; that the United States has never acquired or paid for any right to flow these lands, and no such right has ever been acquired by judgment or otherwise, unless by prescription as to that part of the lands outside of the present dike or embankment, which may have been overflowed for twenty years or more; that the dike was built in the years 1917–1919 for the purpose of preventing further destruction and tearing away and loss of lands of the defendant corporation within the space bounded by the Wolf river, the Bay Boom cut, and the dike, and to reclaim and restore any part thereof that had been washed away within the last twenty years, said carrying away having been caused mainly in the last sixteen or eighteen years by the illegal placing of flush-boards in the dam at Menasha from 1900 to 1905; that of the 600 acres of land or more inclosed within the limits of the dike and the Bay Boom cut and the Wolf river something more than one third and less than one half has been torn loose and washed away by the violence of the spring floods since the placing of these flush-boards; that the same has been torn away in large pieces, as much as twenty, forty, sixty, and eighty acres in one tract or piece; that the space formerly occupied by the land thus washed away is covered in high water by a few inches of water and on the surface thereof is floating bog, aquatic plants, weeds, and wild rice; that if the land remaining were not protected by the dike, it is reasonably certain that a large part thereof would soon be washed away and destroyed; that the dike is not a nuisance and does not interfere with or prevent the exercise and enjoyment of any rights or privileges of the relators or of the public; that the dike is a legal and lawful structure and that defendants have the right to construct and maintain the

same; that the construction and maintenance thereof is necessary for the protection and preservation of the lands of the defendant and for the reclaiming of that part of the lands which has been lost within the period of twenty years prior to the erection and construction of the dike.

As conclusions of law the court found that the land within the limits of the dike is the property of the defendant corporation; that defendant is entitled to have the dike constructed and to maintain the same for the protection of its lands and the reclamation of that part lost within the twenty years prior to the building of the dike; that the dike is a lawful structure and not a nuisance; that it does not interfere with the rights of the public nor affect navigation; and that the permit of the United States for the erection of the dike is valid in force and effect.

Judgment was entered dismissing relators' complaint on the merits, from which judgment this appeal is taken.

For the appellants there was a brief by *Thomas H. Gill* and *Arthur R. Barry,* both of Milwaukee, and oral argument by *Mr. Gill.*

For the respondents there was a brief by *Paul D. Durant* of Milwaukee and *Thompson, Gruenewald & Hull* of Oshkosh, and oral argument by *J. C. Thompson.*

The following opinion was filed July 17, 1920:

SIEBECKER, J.    It is substantially conceded that the area of land in controversy lying within the bounds of the Wolf river on the west and north, the Boom cut-off on the north and east, and the dike involved in this action, embraces about 600 acres, and that defendant is in possession thereof; that it has been and now is used as trapping, fishing, and hunting grounds.    The court found, among others, the following facts: (1) That the state conveyed this area as lands and that they were in fact swamp lands; (2) that they were injured by the rise of the water level in Lake Winne-

bago incident to the erection of the Menasha dam; (3) that large areas of the 600-acre tract have been injured by the increased high water caused by placing and keeping eight-inch flush-boards on the crest of this dam in the years from 1900 to 1905; (4) that such injury to the lands due to such placing of the flush-boards on this dam caused a loss of the surface of a large tract of this area by avulsion; (5) that none of this area was navigable by boats, skiffs, or other water-craft prior to the time the flush-boards were placed in the Menasha dam in 1900, and that the lands were denuded of their surface growth and soil and were thereafter partially covered by water on account of this illegal raising of the water at that time; and that much additional injury will be done to these lands unless protected by the dike in question.

These findings of fact are sharply challenged on this appeal upon the ground that there is no evidence in the record to sustain them. Did the court err in finding that none of the 600-acre area was navigable water before the flush-boards were placed on the crest of the Menasha dam in 1900? We are of the opinion that the court erred in not finding as a fact, upon the evidence adduced, that there were navigable waters within this area prior to the use of the flush-boards in 1900. It appears that this error of the trial court resulted from an erroneous conception of what have been repeatedly held to be navigable waters in this state for the purpose of boating and fishing, in mistaking what is in fact marsh ground as contradistinguished from floating bog, and as to what constitutes avulsion in the law of waters. It appears that the Menasha dam was constructed about 1850, that it raised the waters in the Wolf river and Lake Poygan bordering on the area of land in controversy, and that the waters so raised percolated into the surface soil of the greater part of this 600-acre tract. It is undisputed that the waters of the lake and river were annually maintained at a high stage during the spring

months, extending into June and at times into July; that it then fell below the height of the dam's crest in the dry months of summer, but commonly raised to its high level in the latter part of October and November, where it remained until covered with ice; and that it was lowered by being drained off during the winter to its lowest stage. The evidence is clear that when the water was at its high stages a large part of this area was navigable by boats and water-craft, and that at the highest stages of water in the spring of the year the whole area was covered by water to a depth that made it navigable for all ordinary boats and pleasure craft, and that it was in fact at times used for floating and storing logs therein for commercial purposes. The incontrovertible physical facts shown by the evidence are that the original parts of this marsh ground, after the construction of the dam, became covered with wild rice and other aquatic vegetation during the period from 1851 to 1885 and that the areas so affected covered a large part of the lands in controversy. In this connection it is appropriate to state that these physical facts and conditions refute the statements of some of defendants' witnesses to the effect that the whole area inclosed by the dike was marsh land of the nature and kind it had been originally, as late as 1900 and thereafter. The evidence also clearly shows that much of this area so changed from its natural state was covered by floating bogs. Some of the witnesses evidently erroneously believed that the vegetation in such bogs was a growth of grass and reeds from the soil soaked with water, and they were thereby led to the erroneous opinion that the area so covered by such bogs was not flooded by water. In fact, however, floating bog is a mass of grass, reeds, and other aquatic vegetation which grows and floats on the surface of water in warm weather, which may become frozen into the ice during the winter, and upon the recurrence of high stages of water is carried on its surface, is broken off, and may be moved by the winds and currents to deep

waters, where it is ground to shreds and disappears as sediment on the bed of the water. When it so floats and before it is so destroyed and deposited on the water bed, it is in no sense soil or land. Wherever it forms in the summer season it indicates that there is a substantial amount of water between it and the soil forming the bed of the water. All of the witnesses familiar with the conditions prior to 1900 and reaching as far back as 1875 admit that the area inclosed by the dike had upon it large quantities of floating bog. During the summer seasons these bogs rested on the dry soil until they were again raised by the higher stages of the water during the wet seasons. These physical conditions show that the areas over which these bogs spread were covered by water and that the original soil and marsh grass growing thereon had been gradually changed from dry land to water basins, interspersed with mud and bogs, and having small openings of clear water in dry seasons where ducks and fish abounded among a luxuriant growth of wild rice and other aquatic vegetation. These facts are significantly brought out in the testimony of all witnesses except those who testified to walking all over the area at times, that they observed only a few small water holes, and noted that marsh grass grew there in its natural state. All of such testimony is readily explicable as showing that these witnesses testified to conditions that existed either in dry seasons or that their observations were limited to high ridges of land or that they in fact saw only a small portion of the area inclosed by the dike. It is clear that the overwhelming weight of the evidence establishes the facts that large expanses of this area in ordinary stages of water were in fact navigable by boats, skiffs, and small water-craft at a time long prior to 1900, when the flush-boards were placed on the dam at Menasha, and that the public resorted to these for hunting and fishing in boats and skiffs, except when prevented by the ice in winter and for very limited times in droughty summer seasons. From these facts and

conditions it necessarily follows that considerable portions of the area inclosed by the dike, Wolf river, and Boom cutoff were navigable in fact for a period exceeding twenty years before the commencement of this action and that the circuit court's findings to the contrary have no evidentiary support. It has repeatedly been recognized and held by this court that bodies of water like this one, existing under the conditions referred to above, constitute navigable waters and are subject to the public easement of boating for pleasure as well as profit, and the public cannot be enjoined from hunting and fishing thereon. It matters not whether such waters were originally navigable or were made so through artificial agencies if they in fact existed for a sufficient length of time as navigable bodies of water. In *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661, it is declared that a body of water, much of which disappeared in summer, leaving a considerable expanse of water interspersed with mud, marsh, and bogs, with openings of clear water among a luxuriant growth of rushes and wild rice, but which was navigable *in the ordinary stages of water only* by small craft like canoes or hunting skiffs propelled by paddles, is a lake, and title to the lands under it is in the state and the rights of riparian owners stop at the water line. Although the body of water there in controversy was a meandered lake, the holding is illustrative of what conditions make a body of water a navigable one and subject it to the easement of hunting and fishing.

In *Olson v. Merrill,* 42 Wis. 203, it was declared that navigability of a stream does not require it to be so continuously throughout all seasons of the year. "If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement."

In *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273, an unmeandered stream, "capable in times of high water of floating logs and small rowboats, although at other times rowboats cannot be taken up the stream without dragging or pushing them on the bottom in numerous shallow places," is held to be a navigable stream and subject to the public easement. See, also, *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816; *In re Horicon D. Dist.* 136 Wis. 227, 116 N. W. 12.

It is undisputably established that the land in the area in question became submerged by the raising of the water by the Menasha dam and that the waters thereon are an extension of Poygan lake, and hence the title to the submerged land under the navigable waters is in the state, and the rights of the public to enjoy this easement are correspondingly extended to embrace all the navigable waters within it. *Pewaukee v. Savoy,* 103 Wis. 271, 79 N. W. 436; *Mendota Club v. Anderson,* 101 Wis. 479, 78 N. W. 185; *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816; *In re Horicon D. Dist.* 136 Wis. 227, 116 N. W. 12.

The court found that the raising of the water by the flush-boards on the Menasha dam caused the loss of large tracts from this area by avulsion. We find no evidence in the record to sustain this finding. What is avulsion?

"The terms 'avulsion' on the one hand, and 'gradual and imperceptible accretion,' on the other, are used by writers on alluvion to contradistinguish a sudden disruption of a piece of ground from one man's land to another's, *which may be followed and identified,* from that increment which slowly or rapidly results from floods, but which is utterly beyond the power of identification." *Benson v. Morrow,* 61 Mo. 345.

"The removal of a considerable quantity of soil from the land of one man and its deposit upon or annexation to the land of another, suddenly and by the perceptible action of water." Bouvier, Law Dict. See, also, cases in 6 Corp. Jur. 876, notes 62 and 63.

As above indicated, the evidence shows that the bog referred to by witnesses was floating bog, and that a considerable expanse of the area in question was covered by floating bog prior to the time the flush-boards were placed on the dam in 1900.  It is manifest that when witnesses speak of having observed large areas of grass and soil fastened together by the ice moved by the action of high water in the spring season after 1900, they did in fact see floating bog being carried away.  But it is said the witnesses describe this process as the carrying away of grass and soil.  The infirmity of this class of testimony is that the witnesses state as fact what is in reality an opinion.  Their testimony shows that they had no opportunity to know the actual constituents of what disappeared except by seeing it float.  The fact that it floated negatives their inferences that it was soil; furthermore, it is common knowledge that a cover of ice embedded in ordinary marsh grass, when suddenly raised by water, cannot bodily carry away the soil and roots of grass and wholly denude the bed it rested on and carry it as a float on the rising tide of water.  Such removals indicate that the action of water has imperceptibly undermined the growing surface and produced what is known as bog, which has become separated from the bed of the waters.  This is a slow, imperceptible process which has no relation or analogy to avulsion.  It is also undisputed that the alleged carrying away of the surface out of this area was characterized by a slow process of disintegration and dissipation, and that it disappeared no one knows where.  This rendered it wholly impossible *to follow and identify the masses so carried away and locate them on another's land,* which are essential elements of avulsion.  It is obvious that the evidence wholly fails to show that there was any loss of lands from the inclosed area by avulsion.

It being established that a considerable part of the expanse within the area of the dike was navigable water twenty years and more before this area was so attempted

to be inclosed, it follows that neither the defendants nor any of their predecessors in title to the lands had a legal right to destroy or impair the easement thus acquired by the public and that they had no authority to destroy or injuriously impair such right through the establishment and operation of a drainage system under the statutes. Sub. (1), (2), sec. 30.01; *In re Dancy D. Dist.* 129 Wis. 129, 108 N. W. 202; *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838; *In re Horicon D. Dist.* 136 Wis. 227, 116 N. W. 12.

It necessarily follows that defendants acquired no rights under the establishment of the drainage district covering this area to impair or injuriously affect the public easement of navigation and of hunting and fishing.

It is the settled law of this state that riparian owners cannot encroach on the public rights to such waters. It was held in an early day that the riparian owner's rights to construct embankments are limited, and that he may in case of necessity, where the navigable water is moving away or intruding upon his bank, as against the public, *at his peril of obstructing the public use and at his peril of the necessity,* "intrude, as far as may be necessary, into the water, for the construction of works necessary to the protection of his land against the action of the water." *Diedrich v. N. W. U. R. Co.* 42 Wis. 248. Any other extension by the riparian owner into the water and encroachment upon the soil forming the bed of the navigable water is wrongful and vests no right or title in him to continue the same.

Under the facts shown it is manifest that the defendant cannot construct the dike upon the bed of navigable water. It is also clear that the principal object and purpose of placing the dike as located by the federal permit was to protect the inclosed area from being used by the public for pleasure boating, hunting, and fishing. It is shown that the dike is a serious encroachment on the public easement in that it tends to obstruct the free navigation of the waters and interfere with the public uses of hunting and fishing on

the inclosed waters.   If the defendants' claim that the dike serves to restore the original condition that existed before the lands became submerged by the waters is well founded, then clearly it cannot be maintained, because it would destroy the public easement of navigation and the rights of fishing and hunting.   The federal permit expressly declares that it grants no property rights or exclusive privileges and that the free use by the public of the area inclosed is not to be prevented.   The application for the permit and the grant of it presupposes that there was a body of navigable water; otherwise it was an idle ceremony.   It is considered that the facts show that the construction of the dike was not sought by defendant for the improvement of navigation and that its location and construction is in fact an injury to the public easement and that the federal permit, in the light of the conditions upon which it was granted, does not vest defendant with the right to continue the dike, since it is an encroachment and injury to the enjoyment of the public easements of navigation and the rights of fishing and hunting.

*By the Court.*—The judgment appealed from is reversed, and the cause remanded to the circuit court with direction to award judgment as prayed for in the complaint, enjoining defendant or any one under it from constructing or continuing the dike as contemplated by defendant, and that defendant abate it so as not to encroach upon and interfere with the free use of the public easement to navigable water inclosed thereby.

OWEN, J., took no part.

A motion for a rehearing was denied, with $25 costs, on October 19, 1920.