In re Crawford County Levee and Drainage District No. 1: Haas and others, Respondents, vs. Hutson and others, Appellants.

*December 12, 1923—January 15, 1924.*

*Navigable waters: State as trustee: Drainage scheme which destroys navigable waters: Legality: Evidence: Sufficiency: Permit of War Department: Construction: Swamp-land grants: Jurisdiction of railroad commission: Policy as to navigable waters: Who may abandon.*

1. In view of federal ordinances and acts of Congress, of constitutional and statutory state provisions, and federal and state decisions, no substantial navigable waters can be destroyed for purposes of drainage.  p. 412.
2. Under the Ordinance of 1787, the state became the trustee of the navigable waters within its boundaries for the benefit not only of the people of the state but for the benefit of the people of the whole United States, which trust cannot be extinguished or abrogated by act of the state.  p. 409.
3. A permit issued by the War Department which expressly stated that it did not grant any infringement of federal, state, or local laws or regulations, that there should be no unreasonable interference with navigation, and that the permittee or the owner should not forbid the full and free use of navigable waters at or adjacent to the work, was not an authorization of a state drainage scheme which would have destroyed an interstate ferry route and large areas of navigable waters and rendered useless for navigation several miles of sloughs.  p. 412.
4. Even though in a grant of lands to the state under the Swamp Land Act there is an implied duty to drain them, such duty must be confined to lawful modes of drainage; and such implication could not annul federal ordinances, acts of Congress, and the constitutional provisions of a state.  p. 412.
5. Under evidence showing that the establishment of the drainage district would destroy large areas of navigable waters, prevent an interstate ferry line from running, and render useless for navigation miles of sloughs if the proposed work was carried out, a finding of the railroad commission that the construction of the proposed work will not materially impair the navigability of the navigable waters entered upon was not supported.  p. 415.

6. A proposed drainage district has no legal authority to destroy the navigable waters of the state for the purpose of aiding the navigation of the main channel of the Mississippi river. p. 415.
7. It is not within the power of the railroad commission or of this court or of the state to change navigable waters into agricultural fields, no matter how great the public benefits might be in favor of the latter. p. 415.
8. If the policy of preserving navigable waters is to be abandoned, it is for Congress, not the courts, so to declare. p. 416.

APPEAL from an order of the circuit court for Crawford county: S. E. SMALLEY, Circuit Judge. *Reversed.*

Proceedings to establish a drainage district to be known as the Crawford County Levee and Drainage District No. 1, including what are known as the Winnesheik bottoms adjacent to the Mississippi river and lying between the villages of De Soto and Lynxville, Wisconsin. The lands extend in a northwesterly and southeasterly direction for a distance of about twelve miles, with an average width of about two miles. The whole district contains about 15,000 acres of land and 3,000 acres of water. After the completion of the drainage scheme there will be about 13,000 acres of land and 1,775 acres of water within the levees. The 3,000 acres of water lie almost wholly within the proposed levees and will be reduced to 1,775 acres in area when the district is drained. The railroad commission, to whom the matter was referred under the provisions of sub. 7, sec. 1379—17, Stats., thus aptly describes the proposed method of drainage:

"In order to reclaim these lands and render them suitable for agriculture it is proposed to construct a levee along the river and thus confine the river water at all times to the main and well defined channel of the river and also to construct a diversion levee and canal along the upland side of the reclaimed district, which canal will serve to convey the waters from the uplands adjacent to the district to the river below the district. The water accumulating on the reclaimed district will be collected by means of a system of lateral ditches and pumped over the levee and into the main river."

In its opinion the commission, among other things, said:

"A number of the larger sloughs and ponds within the proposed district were meandered by the government at the time of the original survey, and it appears from the testimony that the waters are navigable for small crafts and are in fact navigated by fishermen and huntsmen and others."
"Some of the smaller sloughs and ponds are disconnected during normal river stages with the main river and with the larger sloughs, thus rendering them inaccessible during such periods of navigation. Most of the larger sloughs have been closed by the construction of low dams at their entrance or point where the water leaves the main river to enter the slough. This work was done some twenty years ago by the United States government under the supervision of the army engineers, and was a means of retaining the main river in the well defined channel and thus preserving and protecting navigation on the main river. The larger sloughs can, however, be entered by boat at their outlet or mouth. It appears also that there is a ferry plying between Ferryville, Wisconsin, and Lansing, Iowa. The course of this ferry is through an artificial connection between the large slough near Ferryville and the Mississippi river. The proposed work will close this water-course and require a new and longer course to be taken or require a portage over the levee. On the other hand, some 1,775 acres of water surface will be retained within the district, or over one half of the present water surface even including such isolated portions as are now inaccessible for navigation. About fourteen per cent. of the total area reclaimed will be retained as water area, and while certain sloughs will be reclaimed, it cannot be said that the proposed work will materially interfere with navigation."
"The evidence clearly shows that the public rights of trapping, hunting, fishing, and navigation will, by no means, be wholly destroyed. In fact, as the work is constructed, it may be found that the damage resulting to such public rights is much less than the opponents of the proposed work now forecast, and that the compensatory public benefits may largely exceed the actual damage suffered by such other public rights."

The commission's formal finding of fact is:

"That the public health and public welfare will be benefited by the construction of the proposed work in accordance

with the application, the preliminary report, and other papers and files made a part of the application; that the construction of the proposed work in accordance with the application will not materially impair the navigability of the navigable waters entered upon and will not materially impair any other public right in or public uses of such waters or streams. No finding of the minimum water level to be maintained is made. The statutes here apply to the level of water maintained by dams or other obstructions in navigable waters."

Upon a return to the trial court of the opinion and findings of the railroad commission, the court, upon due proceedings had, found, *inter alia:*

"That said proposed work is necessary and will be of utility in carrying out the purposes of the petition for the organization of said district.

"That the proposed work will promote both the public health and public welfare.

"That the total benefits resulting from the proposed work will exceed the cost of construction thereof, and in arriving at such benefits and cost of construction the commissioners included the benefits and damages both within and without the district resulting from such work."

It entered an order confirming, except as modified, the preliminary report of the commissioners and directed them to proceed with the work. From such order the remonstrants appealed.

For the appellants there was a brief by *Graves & Earll* and *J. P. Evans,* all of Prairie du Chien, and oral argument by *J. S. Earll.*

For the respondents there was a brief by *Buell & Lucas* of Madison and *Munson & Curran* of Prairie du Chien, and oral argument by *Frank W. Lucas.*

VINJE, C. J.    It is evident from a reading of the foregoing statement of facts that the initial question for the court's determination is whether or not the proposed drainage scheme, if carried out, would destroy navigable waters of the state. If it would, then it must be abandoned, for

navigable waters of the state cannot lawfully be destroyed through a drainage scheme. *In re Dancy D. Dist.* 129 Wis. 129, 108 N. W. 202; *In re Horicon D. Dist.* 136 Wis. 227, 116 N. W. 12; *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838; *Att'y Gen. ex rel. Becker v. Bay Boom W. R. & F. Co.* 172 Wis. 363, 178 N. W. 569.

Our state was organized out of the Northwest Territory, and the Ordinance of 1787 establishing such territory contained the provision that "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor." Substantially the same provisions were incorporated into the act of April 20, 1836, establishing the territorial government of Wisconsin, and in the act of August 6, 1846, enabling the people of the territory of Wisconsin to form a state. And in order that the provisions of the Ordinance of 1787 should be carried out our constitution included this provision:

"The river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost, or duty therefor."

The above provisions of our organic law have found complete or partial expression in legislative declaration dating from ch. 72 of the Laws of 1853 to our present statutes on the subject, sec. 30.01, sub. (1) and (2) of which provide:

"*Lakes.* All lakes wholly or partly within this state which have been meandered and returned as navigable by the surveyors employed by the government of the United States, and all lakes which are navigable in fact, whether meandered

In re Crawford County L. & D. Dist. 182 Wis. 404.

or not meandered, are hereby declared to be navigable and public waters, and all persons shall have the same rights therein and thereto that they have in and to any other navigable or public waters."

"*Streams.* All rivers and streams which have been meandered and returned as navigable by the surveyors employed by the government of the United States, and all rivers, streams, sloughs, bayous and marsh outlets, whether meandered or non-meandered, which are navigable in fact for any purpose whatsoever, are hereby declared navigable to the extent that no dam, bridge, or other obstruction shall be made in or over the same without the permission of the legislature."

From our acceptance of the provisions referred to of the Ordinance of 1787 it follows that it is not a question of state policy as to whether or not we shall preserve inviolate our navigable waters. We are by organic law compelled so to do. *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409. That we have scrupulously endeavored to carry out the mandate of the organic law and of the legislative enactments quoted, the decisions of this court abundantly show. We are the trustee of the navigable waters within our borders for the benefit not only of the people of our own state but for the benefit of the people of the whole United States. And this trust we cannot diminish or abrogate by any act of our own. We accepted the trusteeship in our organic law as a condition of becoming a state, and we must execute it according to its intent and purpose until released by action other than that of this state. *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409. Neither the state nor this court has anything to do with the wisdom of the policy of keeping inviolate our navigable waters. The supreme law so directs, and its mandate not only justifies but compels the continuance of the policy. How faithfully this court has carried out the supreme behest can be seen from an examination of the cases already cited and from the following, among others: *Olson v. Merrill,* 42 Wis. 203; *Weatherby v. Meikle-*

*john,* 56 Wis. 73, 13 N. W. 697; *A. C. Conn Co. v. Little Suamico L. Mfg. Co.* 74 Wis. 652, 43 N. W. 660; *Falls Mfg. Co. v. Oconto River Imp. Co.* 87 Wis. 134, 58 N. W. 257; *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661; *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273; *Bloomer v. Bloomer,* 128 Wis. 297, 107 N. W. 974; *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816; and *Doemel v. Jantz,* 180 Wis. 225, 193 N. W. 393.

In *Diana Shooting Club v. Husting* this court said:

"The wisdom of the policy which, in the organic laws of our state, steadfastly and carefully preserved to the people the full and free use of public waters, cannot be questioned. Nor should it be limited or curtailed by narrow constructions. It should be interpreted in the broad and beneficent spirit that gave rise to it in order that the people may fully enjoy the intended benefits. Navigable waters are public waters, and as such they should inure to the benefit of the public. They should be free to all for commerce, for travel, for recreation, and also for hunting and fishing, which are now mainly certain forms of recreation. Only by so construing the provisions of our organic laws can the people reap the full benefit of the grant secured to them therein. This grant was made to them before the state had any title to convey to private parties, and it became a trustee of the people charged with the faithful execution of the trust created for their benefit."

The United States supreme court has likewise steadfastly adhered to the complete execution of the policy of preserving navigable waters in states carved out of the Northwest Territory. To what extent it has gone can be seen by an examination of *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409. It there appears that the Desplaines river in Illinois had been used in an early day and down to about 1825 as a link in a well known water route between Lake Michigan and the Mississippi river, but had not been used since about 1825 and is not under existing conditions useful for navigation, and yet it was held to be a navigable stream.

The supreme court of the United States refused to follow the decision of the Illinois supreme court in *People ex rel. Deneen v. Economy L. & P. Co.* 241 Ill. 290, 89 N. E. 760, holding the river non-navigable, saying:

"The Desplaines river, after being of practical service as a highway of commerce for a century and a half, fell into disuse, partly through changes in the course of trade or methods of navigation, or changes in its own condition, partly as a result of artificial obstructions. In consequence, it has been out of use for a hundred years; but a hundred years is a brief space in the life of a nation; improvement in the methods of water transportation or increased cost in other methods of transportation may restore the usefulness of this stream; since it is a natural interstate highway, it is within the power of Congress to improve it at the public expense, and it is not difficult to believe that many other streams are in like condition and require only the exertion of federal control to make them again important avenues of commerce among the states. If they are to be abandoned, it is for Congress, not the courts, so to declare." Page 124.

The court's conclusion as to the right of a state to destroy or interfere with navigable waters within its borders is thus summarized in the headnotes:

"The public interest in navigable streams of this character in Illinois and neighboring states, and the federal authority over such as are capable of serving interstate commerce, arises not from custom or implication but from the declaration of the fourth article of the compact in the Ordinance of July 13, 1787, for the government of the Northwest Territory, that the navigable waters leading into the Mississippi and St. Lawrence and the carrying places between the same shall be common highways and forever free, etc.,—a principle which was reiterated in later acts of Congress and accepted by Illinois in her constitution at the time of her admission as a state. In so far as the Ordinance of 1787 thus established public rights of highway in navigable waters capable of bearing commerce from state to state, it was no more subject to repeal by a state than any other regulation of interstate commerce enacted by Congress."

It will thus be seen that in view of federal ordinances and acts of Congress, of constitutional and statutory state provisions, and federal and state decisions, no substantial navigable waters can be destroyed for purposes of drainage.

But it is claimed that the permit issued by the War Department grants federal authority to carry out the drainage scheme. In this plaintiffs are mistaken. The permit expressly states that it does not grant "any infringement of federal, state, or local laws or regulations." "That there shall be no unreasonable interference with navigation by the work herein authorized," and "that no attempt shall be made by the permittee or the owner to forbid the full and free use by the public of all navigable waters at or adjacent to the work or structure." In *Att'y Gen. ex rel. Becker v. Bay Boom W. R. & F. Co.* 172 Wis. 363 (178 N. W. 569), at page 376 this court said:

"The federal permit expressly declares that it grants no property rights or exclusive privileges and that the free use by the public of the area inclosed is not to be prevented. The application for the permit and the grant of it presupposes that there was a body of navigable water; otherwise it was an idle ceremony. It is considered that the facts show that the construction of the dike was not sought by defendant for the improvement of navigation and that its location and construction is in fact an injury to the public easement and that the federal permit, in the light of the conditions upon which it was granted, does not vest defendant with the right to continue the dike, since it is an encroachment and injury to the enjoyment of the public easements of navigation and the rights of fishing and hunting."

This statement is equally applicable to the case at bar.

As to the claim that these lands were granted to the state under the Swamp Land Act and therefore there was an implied grant or duty to drain them, all that need be said is that such grant or duty must be confined to lawful modes of drainage, not to unlawful ones. It is not thinkable that such implication has the force to annul federal ordinances, acts of Congress, and constitutional provisions of a state.

It remains to consider whether the finding of the railroad commission "that the construction of the proposed work in accordance with the application aforesaid will not materially impair the navigability of the navigable waters entered upon and will not materially impair any other public right in or public uses of such waters or streams," has any support in the evidence. Happily there is no conflict in the evidence upon this subject. Mr. Young, the district engineer, testified:

"This proposed levee will dam up all the sloughs and tributaries of the Mississippi river and overflow channels lying within it from the main river. It would cut off all navigation from the main river to and through the sloughs within the proposed district."

William Cook, a resident of Ferryville for twenty years, engaged in commercial fishing, testified:

"As to the extent to which these waters are navigable for small boats at a three-foot stage, we travel on the Pattee, the Melton, the Frenchman, the Capital 'I,' the Dutch Henry, the Winnesheik, the Stevens, the Drift, and Gordon sloughs, and all those little sloughs at a three-foot stage. We travel them all with boats. As commercial fishermen, we use them, all together, we all use gas boats nowadays. What we call gasoline launches and small gas boats. Outside the use for fishing and clamming they are not much used for navigation, not during the last ten years. They are used extensively for those purposes, and of course we have hunters there in the fall, but that is just in the fall. There are some fishermen and sportsmen at other seasons. They use them the same way. These sloughs, these tributaries, are used for floating logs. They have been generally used for that purpose."

Mr. Guy Hudson, a resident of Ferryville who had been engaged in commercial fishing in the proposed district for fifteen years, testified:

"We carry on this fishing by boats, motor boats particularly. Quite a number of the sloughs and tributaries of the Mississippi river which flow through this section are navi-

gable.    That is the only means of carrying on this fishing industry.    We get around practically all of this district in these boats."

Several other old residents near the district gave substantially the same testimony, and there is nothing in the whole record to contradict it.

It is said in the opinion of the railroad commission that the ferry from Ferryville, Wisconsin, to Lansing, Iowa, would, because of the proposed work, require a portage over the levee or else take a new and longer course.    The new and longer course, we are informed, would be by a route outside the diversion levee south beyond the southern end of the district and thence north through the main channel of the Mississippi river.    This route would add over ten miles to the distance, is not in existence, is not provided for in the drainage scheme, nor is the portage over the levee provided for.    The result is that the proposed work as it is now planned would entirely destroy this interstate ferry route.    But were it otherwise, the evidence shows that about two square miles of navigable waters inside of the levees would be wholly destroyed, and the navigability of the remaining 1,775 acres would be materially impaired by the lowering of the water level within the levees.    Miles of navigable sloughs would be wholly drained or drained to such an extent as to materially impair their navigability. The fact that the drainage ditches would be deep enough to float boats cannot offset the destruction of square miles of navigable waters and the destruction of interstate waterways actually used as such.    With no ingress and no egress to boats from the main river, the inclosed water areas would be practically useless to the public.    But even if ingress and egress were provided by suitable portages or locks kept up by the district, there would be a destruction of so much navigable waters as to condemn the scheme.

It is argued in the opinion of the railroad commission that the proposed work would aid the navigation of the main

river. This may be granted, though it is quite doubtful if there would be a material aid in the navigation of the river opposite the district, because these sloughs are largely backsets of the river owing to the fact that the United States government has closed the northern ends where the water used to enter. The evidence shows that now nearly all must be entered at their mouth or southern end, so the water in the Mississippi opposite the district would remain practically the same. Below and above the district it is evident the flow would be the same. But however that fact may be, it is clear that the proposed district has no legal authority to destroy navigable waters of our state for the purpose of aiding the navigation of the main channel of the Mississippi river.

It is evident that the railroad commission sensed the difficulty of finding that no substantial navigable waters would be destroyed, for it said: "The evidence clearly shows that the public rights of trapping, hunting, fishing, and navigation will by no means be *wholly* destroyed," implying that there will be substantial destruction of these rights. It sought to justify it by stating that "the compensatory public benefits may largely exceed the actual damage suffered by such other public rights." By compensatory public benefits must be meant the benefit accruing to the public by having this land reduced to an agricultural state, for there is no serious claim or showing that the present condition of the district is injurious or dangerous to public health. But, as has already been pointed out, it does not lie within the power of the railroad commission or of this court or of the state to change navigable waters into agricultural fields, no matter how great the public benefits might be in favor of the latter.

We thus have a case where, upon undisputed evidence, large areas of navigable waters would be destroyed, an interstate ferry line prevented from running, and miles of sloughs rendered useless for navigation if the proposed work is carried out. Under such circumstances there is no

support whatever in the evidence for the finding of the railroad commission, and it must be and is set aside.

In *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838, much relied upon by respondents as in all material respects similar to this case, the evidence showed that the proposed drainage scheme would improve the navigation of the Trempealeau river, and would not destroy or materially impair any navigable waters. Here the evidence is just the contrary, and the case relied upon is therefore not in point.

If it be said that it is a hardship upon the owners of the lands not to be able to drain them by this method, the only answer the court can make is that neither federal nor state laws permit it, and that such laws were in existence when they bought the lands. Perhaps some scheme to drain at least a part of them without the destruction of navigable waters may be found. But if not, insuperable legal barriers declared and maintained for over a century prevent their drainage under the proposed scheme. If our policy of preserving our navigable waters is to be abandoned, "it is for Congress, not the courts, so to declare," as was aptly said in *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409. The result reached renders it needless to discuss the other questions raised by the appellants.

*By the Court.*—Order reversed, and cause remanded with directions to enter judgment dismissing the proceedings.