524

FLAMBEAU RIVER LUMBER COMPANY, Respondent, vs.
RAILROAD COMMISSION OF WISCONSIN, Appellant.

*December 11, 1930—May 12, 1931.*

526

For the appellant there was a brief by the *Attorney General* and *Suel O. Arnold* of Milwaukee, special counsel, and oral argument by *Mr. Arnold*.

For the respondent there was a brief by *Quarles, Spence & Quarles* of Milwaukee and *J. W. Carow* of Ladysmith, attorneys, and *J. V. Quarles* of Milwaukee of counsel, and oral argument by *Arthur Wickham* of Milwaukee.

ROSENBERRY, C. J.  Certain questions relating to the validity and interpretation of ch. 640 of the Laws of 1911, the act under which the Chippewa and Flambeau Improvement

Company was organized, have been considered by this court in two previous cases, *Chippewa & Flambeau Imp. Co. v. Railroad Comm.* 164 Wis. 105, 159 N. W. 739, and *Flambeau River L. Co. v. Railroad Comm.* 198 Wis. 134, 223 N. W. 417. In the latter case, referring to ch. 640, Laws of 1911, it was said:

"We find the legislative purpose to be to improve and not to destroy navigation, and, especially, to improve the navigation of said Flambeau river for the running, driving, rafting, booming, storing, sorting, and delivering of logs, timber and lumber, and other forest products. This plainly indicates that the legislative purpose was to promote and not destroy navigation. According to the allegations of the com-

plaint, the results obtaining from the operation of the dams are exactly contrary to those which were intended to be promoted by the grant. The grant of power was for the purpose of improving the navigability of the Flambeau river for driving logs, but, as the dams have been operated, the navigability of the river for that purpose is entirely destroyed."

The complaint in that case contained an allegation that withholding of the water was not done pursuant to the order or approval of the Railroad Commission. In this action the plaintiff attacks the order made by the Railroad Commission authorizing the withholding and impounding of water by the operation of the dams in question on the ground that when

operated in accordance with the order of the commission the navigability of the river is in fact destroyed. The defendant seeks to sustain the order on the ground that the act was designed to provide a uniform stream-flow and thereby improve navigation and promote public use of the Flambeau river; that the act created a state agency for the operation of the reservoirs, and that the operation of the reservoir dams under the order of the commission will produce a uniform flow and so promote the public uses of the stream. The controversy in this case arises because of the conflict of interest between one group which wishes to use the river for log-driving and a second group which wishes to utilize it for the

purpose of developing hydraulic power. Inasmuch as log-driving is from the standpoint of one wishing to develop water power very wasteful of water and must be done at seasons when the reservoirs should be filled by withholding water, the conflict of interest seems almost irreconcilable. It appears from the findings of the court, which are well sustained by the evidence, that in order to carry on, in a reasonably prudent and practical manner, log-driving, the flow of the river must very largely exceed 150 cubic feet per second, the minimum fixed by the order of March 3, 1928. The court finds that successful log-driving requires a minimum of 1,300 cubic feet of flow per second in the Flambeau river,

measured at the United States gauging station near Butternut, Wisconsin.

It was further adjudged that the Flambeau river is a navigable stream and the right to navigate the same is protected by sec. 1 of art. IX of the Wisconsin constitution and by the Ordinance of 1787; that it was not the intention of the legislature by the enactment of ch. 640 of the Laws of 1911 to destroy or injure navigation upon said river. The judgment results in this: that a stream-flow of 1,300 cubic feet per second at the point in question is a minimum for log-driving purposes; that the plaintiff and other navigators are entitled to such minimum flow, and that the right to navigation is an

inalienable right protected by the constitution and the Ordinance of 1787 and therefore it may not be impaired. Upon no other theory could the court adjudge that the plaintiff was entitled to the minimum flow found by it to be reasonably necessary for log-driving purposes. If the right of navigation is subject to reasonable regulation, then the making of such regulation is a matter for the legislature or agencies created by it and not for the court.

The attack made upon the judgment and findings in this case requires us to consider and determine whether or not the right to navigation of streams in this state is a primary inalienable right. We are not required in this case to determine the extent to which the legislature may go in determin-

ing what use shall be made of the navigable rivers, because, as was held by the trial court and by this court, the legislature has not sought to destroy or even impair navigation but merely to improve and regulate it. However, if the right of a navigator to use the normal flow of the stream except such as may be in excess of 1,300 cubic feet per second is a right protected by the constitution and the Ordinance of 1787, a regulatory order which deprived navigators of that right would be void.

First, with respect to the Ordinance of 1787. This ordinance was passed July 13, 1787, nearly one year and eight months before the constitution of the United States took effect. Speaking of the effect of this ordinance upon the

state of Illinois, which was part of the Northwest Territory, the supreme court of the United States said:

"Whatever the limitation upon her powers as a government whilst in a territorial condition, whether from the Ordinance of 1787 or the legislation of Congress, it ceased to have any operative force, except as voluntarily adopted by her after she became a state of the Union. On her admission, she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original states. She was admitted and could be admitted only on the same footing with them. . . . Equality of constitutional right and power is the condition of all the states of the Union, old and new. Illinois, therefore, as was well observed by counsel, could afterwards exercise the same power over rivers within her limits that Delaware exercised over Blackbird creek, and Pennsylvania over the Schuylkill river. *Pollard's Lessee v. Hagan,* 3 How. 212; *Permoli v. First Municipality,* 3 How. 589; *Strader v. Graham,* 10 How. 82." *Escanaba & L. M. Trans. Co. v. Chicago,* 107 U. S. 678, at p. 688, 2 Sup. Ct. 185.

There is nothing in *Economy Light & Power Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409, inconsistent with this view. On the contrary, it confirms and strengthens the prior holding. It is there said (p. 120):

"To the extent that it pertained to internal affairs, the Ordinance of 1787, notwithstanding its contractual form, was no more than a regulation of territory belonging to the United States, and was superseded by the admission of the state of Illinois into the Union 'on an equal footing with the original states in all respects whatever.' (Citing cases.)

"But, so far as it established public rights of highway in navigable waters capable of bearing commerce from state to state, it did not regulate internal affairs alone, and was no more capable of repeal by one of the states than any other regulation of interstate commerce enacted by the Congress; being analogous in this respect to legislation enacted under the exclusive power of Congress to regulate commerce with the Indian tribes."

Referring to the *Escanaba* and other cases, the opinion continues:

"Those cases simply hold, in effect, that a state formed out of a part of the Northwest Territory has the same power to regulate navigable waters within its borders that is possessed by other states of the Union; that is to say, until Congress intervenes, the power of the state, locally exerted, is plenary; nevertheless, where the navigation serves commerce among the states or with foreign nations, Congress has the supreme power when it chooses to act, and is not prevented, by anything the states may have done, from assuming entire control in the matter."

Language was used in *In re Crawford County L. & D. Dist.* 182 Wis. 404, 196 N. W. 874, which to some extent is inconsistent with the holding of the United States supreme court. Being once admitted, the state of Wisconsin had the same plenary power over navigable waters within the state that any of the thirteen original states had. The legislature may exercise that power unless its power in that regard has been limited by provisions of our own constitution.

Art. 4 of the Ordinance of 1787 provides:

"The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor."

Sec. 3 of the Wisconsin Enabling Act, which enables the people of the Wisconsin territory to form a constitution and state government, contained the following provision:

"That the said state of Wisconsin shall have concurrent jurisdiction on the Mississippi and all other rivers and waters bordering on the said state of Wisconsin, so far as the same shall form a common boundary to said state and any other state or states now or hereafter to be formed or bounded

by the same; and said river and waters, and the navigable waters leading into the same, shall be common highways, and forever free, as well to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, impost or toll therefor."

The substance of these clauses became sec. 1 of art. IX of the constitution of this state, as follows:

"The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state, so far as such rivers or lakes shall form a common boundary to the state, and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

The facts in the case of *Milwaukee G. L. Co. v. Schooner "Gamecock,"* 23 Wis. 144, arose in 1866. In 1864 the common council of the city of Milwaukee adopted an ordinance forbidding any vessel to drag its anchor while being towed. The plaintiff company had laid its gas pipes across the Menominee river. The Gamecock being towed stern foremost with its anchor dragging from the bow, the anchor caught and injured plaintiff's gas pipes. Suit was brought for damages. The trial court instructed the jury that "if it was a proper act of navigation for vessels passing up and down a navigable stream to drag their anchors on the bottom, if it was an act incident to the sailing of vessels and towing them out of harbors or narrow streams, an ordinance of the city could not prohibit it." This court held that the instruction was a correct statement of the law applicable to the case. The head-note of the case is as follows:

"A city ordinance or an act of the state legislature, forbidding vessels to drag their anchors in a navigable stream, would be invalid as far as it interfered with the rights of navigation secured by the Ordinance of 1787."

From the case and head-note has been deduced the proposition that rights secured by the Ordinance of 1787 cannot be impaired by state legislatures. A careful analysis of the case reveals nothing upon which that proposition can rest. The Menominee river at the point in question was one undoubtedly navigable within the meaning of that term as used in the Ordinance of 1787, the Enabling Act, and the Constitution of the state of Wisconsin, and therefore under the control of Congress. The city ordinance forbade any vessel, whether engaged in intrastate or interstate commerce, to drag its anchor while being towed. But how or in what way the power of the legislature to deal with navigable waters was presented in that case we are unable to see.

In *Wisconsin River Imp. Co. v. Manson,* 43 Wis. 255, it was held that the provisions of sec. 1 of art. IX of the state constitution did not deprive the legislature of power to authorize the clearing out of the channel and construction of works in a navigable stream, at points where its waters are either unnavigable or only partially navigable, for the purpose of improving the navigation of the stream, and that the legislature might authorize the agency making the improvement to charge a reasonable toll as compensation therefor. And this court cited with approval the language of Judge LEAVITT in *Spooner v. McConnell,* 1 McLean, 337, as follows:

"So far as it was intended to restrict the action or power of the states or individuals, it was to disable them from the infliction of public injury. The people of the United States were not to be deprived of the use of the water-courses in the Northwest Territory by any unjust or wanton exercise of power over them; but it was not contemplated that the hands of the states should be so tied up as that it should not be in their power to remove a natural impediment to navigation, or avoid such an impediment by canals and other improvements. A contrary construction would be a perversion of the great and primary design of the clause. It would

embarrass, if not entirely arrest, some of the great works of internal improvement in progress or projected in the West."

This court then said:

"These remarks of Judge LEAVITT, in exposition of the clause of the Ordinance of 1787, are equally applicable to the provision of the constitution under consideration," citing five prior Wisconsin decisions.

A discussion of the whole subject, including a review of the state and federal cases down to the time of the decision in 1888, is to be found in *J. S. Keator L. Co. v. St. Croix Boom Corp.* 72 Wis. 62, at page 80 *et seq.* (38 N. W. 529). It is not necessary for us to repeat here what was so well said there. So far as material, the holding in that case briefly stated is as follows:

"The provision of the Ordinance of 1787 (incorporated also into the acts of Congress enabling Wisconsin and Minnesota to organize state governments, and into the constitutions of said states) that 'the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, . . . without any tax, impost, or duty therefor,' was not intended to prevent obstructions to the navigation of such waters, but to prohibit the levying of a tax on such navigation. And in the absence of other legislation by Congress, such states may authorize the construction in such waters of booms for the interception, storage, and handling of logs, even though they will materially interfere with navigation by steamboats and other water-craft."

The cases cited in the *St. Croix Boom Corp. Case* afford ample authority for the proposition that under the Ordinance of 1787 and under the applicable provision of our constitution, in the absence of Congressional action, the power of the state over navigable waters lying within the state is plenary. In a consideration of the authorities care must be taken to distinguish between those cases dealing with the exercise of a delegated authority by boom and improvement companies and other similar state agencies and cases dealing with

the power of the state itself, acting through its legislature. The language in *In re Crawford County L. & D. Dist.* 182 Wis. 404, 196 N. W. 874, must be so considered. In that case proceedings were being had under the provisions of ch. 76aa relating to drains, and the question presented was whether or not, in the course of draining certain areas, authority to destroy navigable waters was conferred. It was held that it was not within the power of the Railroad Commission or a drainage district to destroy the navigable waters of the state proceeding under the act, and although it was said in that case that "It does not lie within the power of the Railroad Commission or of this court or of the state to change navigable waters into agricultural fields, no matter how great the public benefits might be in favor of the latter," the holding as to the power of the state must be considered *obiter,* as the power of the state over navigable waters was in no way involved in the case. The power of the state to authorize the destruction of steamboat navigation in favor of navigation of the St. Croix river by logs was sustained as an exercise of the plenary power of the state over its navigable waters.

In *Cohn v. Wausau Boom Co.* 47 Wis. 314, 2 N. W. 546, it was held that the right of a riparian owner on navigable water to construct wharves, piers, and booms in aid of navigation, to reach actual navigable water, was subordinate to the public use of the water and might be regulated or prohibited by law.

In *Green Bay & Mississippi Canal Co. v. Kaukauna Water Power Co.* 90 Wis. 370, 61 N. W. 1121, 63 N. W. 1019, it was held that the state could divert all or any part of the stream-flow for purposes of improving navigation, but that it could not erect a dam or any other improvement in Fox river for the sole purpose of creating a water power to be leased for manufacturing purposes, if such improvement should work injury to a lower riparian owner.

In *Wisconsin River Imp. Co. v. Pier,* 137 Wis. 325, 118 N. W. 857, it was held that the power of eminent domain might be exercised in aid of the construction of a dam in aid of navigation, although the power to be thereby developed largely exceeded the value of the revenues to be derived from navigation; and further, that the extent to which the dam will benefit navigation is not to be measured by its cost nor the motives which impelled its construction.

The nature of this plenary power of the state is discussed and defined in *U. S. v. Chandler-Dunbar W. P. Co.* 229 U. S. 53, 33 Sup. Ct. 667. The power of a state over its navigable waters is discussed to some extent in *Connecticut v. Massachusetts* (U. S.) 51 Sup. Ct. 286, 75 Lawy. Ed. 297. Enough has been said to indicate that the right of a navigator to the flow of the stream is subject to reasonable control and regulation by the state in the public interest. It is not necessary for us to determine in this case whether or not the state may destroy the navigability of a river for the purpose of making the stream more useful for hydraulic purposes. It has been held that the creation of hydraulic power when authorized by the legislature is a public purpose in *Wisconsin River Imp. Co. v. Pier, supra.*

There remains then for us to inquire whether or not the order of March 3, 1928, is a proper exercise by the Railroad Commission of the power conferred upon it by ch. 640 of the Laws of 1911. In the consideration of this question it must constantly be borne in mind that we are investigating not the power of the legislature to act in the premises but the exercise of a power conferred upon an administrative agency, the Railroad Commission. The power exercised by the Railroad Commission is derived from sec. 6 of ch. 640 of the Laws of 1911:

"Such railroad commission shall cause the height to which the water may be raised by any dam to be indicated by permanent monuments and bench marks, and shall have supervision and control of the time and extent of the draw-

ing of water from the reservoirs, and the power to compel the maintenance of all reservoirs established. . . ."

Manifestly this power must be exercised to accomplish the declared purpose of the act, (1st) to improve navigation for log-driving purposes, and (2d) to maintain as nearly as practicable a uniform flow of water in accordance with the provisions of the act. If the order of March 3, 1928, accomplishes one purpose at the expense of the other, having due regard to the situation with which the legislature was dealing, it must be apparent that the commission has not properly exercised its power. It is not enough for the commission to prescribe a minimum flow in the river regardless of whether the condition thereby created will destroy the practical navigation of the stream. No doubt the power was conferred upon the Railroad Commission to regulate the flow of the stream in order that flexible standards might be erected and maintained and the stream made useful for practical purposes. The trial court found, and the evidence sustains the finding, that if the dams be operated in accordance with the order, not enough water will be available during the usual and customary log-driving season to make the stream practically navigable for that purpose. It may well be that in the opinion of the commission the use of the water for hydraulic power purposes may be from a public standpoint more important than the use of the water for purposes of navigation. Upon that point the terms of the act foreclose the commission. Its duty is to improve navigation, not destroy it or substantially impair it. If one purpose may be said, under the terms of the act, to be more important than another, that place must be accorded to navigation. If with the passage of time navigation has been of decreasing importance, a new situation has arisen which must be dealt with by the legislature. The Railroad Commission is limited in the exercise of its authority to the power conferred upon it by the act. By the terms

of the second paragraph of the order navigators are required to notify the Chippewa and Flambeau Improvement Company and the Railroad Commission not less than five days before they intend to commence a log-drive and specify the place where and the probable time when such log-drive will commence, such notice to be followed by a final notice. There is, however, no provision in the order by which the intending navigator is assured that he will at the time and place be provided with navigable water. If the stream-flow is to be impounded and appropriated in the interest of hydraulic power, it can scarcely be considered reasonable or practicable to require a navigator to be upon the scene at the appointed time with a crew of men with no assurance that navigation will be possible or at best dependent upon the exercise of discretion by some person whose discretion is subject to no established standard. The court finds that the impounding of water to the extent required by the order would under normal circumstances absorb substantially the normal stream-flow and that a minimum of 150 cubic feet per second is totally inadequate for log-driving purposes. Under the order the navigator would have to follow a catch-as-catch-can policy, to be on hand awaiting an adequate stream-flow when and if it arrived. This clearly makes navigation subordinate to maintenance of regulation of stream-flow and as a practical matter destroys it.

Manifestly there may be times and seasons when there will be no navigation that will not be adequately served by the minimum prescribed at such times. There is no reason why the flow of the stream should not be impounded for power purposes if it be done without damage to lower riparians. It is apparent that the intending navigator cannot arbitrarily require a log-driving stage of water in the river when no useful purpose is to be served thereby and so vindicate a barren, naked legal right if such exists. It is considered that it is not within the province of the court to exercise its judgment as to the amount of water reasonably necessary

for purposes of navigation, and certainly it could not determine the proper times for the release of impounded water. These are clearly administrative matters. It should be said that there has been no effort to operate under the terms of the order of March 3, 1928. The plaintiff ceased its logging operations for the declared reason that it cannot safely proceed therewith because under the order the practical navigability of the river for log-driving purposes was destroyed. If under the terms of the order intending navigators were given the right to the use of a stream-flow reasonably adequate for the purposes of navigation as and when they were prepared to use it and have it continued for a reasonable length of time to complete the operation, the order would undoubtedly comply with the terms of the act. The plaintiff is entitled to water at the times and in the quantities necessary to make the stream navigable for the transportation of forest products in accordance with the customary practice of log-drivers. It is not sufficient to furnish water enough to float a cedar fencepost. Water should be furnished to make such navigation as there is reasonably practicable in accordance with established practice. So far as we are able to discover, no attempt has been made to make the findings and conclusions necessary to create such a situation. The order should be so framed as to improve navigation to the extent that navigation exists. The right of the navigator, on the other hand, should be exercised reasonably and not so as to be unreasonably destructive of other public interests.

From what has been said it is apparent that the order of March 3, 1928, should be vacated and set aside. It is also apparent that it is not the function of the court to determine what flow of water is reasonably necessary for purposes of navigation. The court cannot substitute its judgment for that of the commission any more than it can, in setting aside a rate as unreasonable, determine what in fact is a reasonable rate. To make such determination is to exer-

cise a power which the court does not possess under our system of law.

It is suggested that a spirit of reasonableness and co-op-eration would go far in solving the problems presented by the conditions which exist on many of the interior navigable waters of the state, to the end that the natural resources of the state shall be made available to the highest extent reasonably possible for all public purposes.

*By the Court.*—That part of the judgment appealed from which sets aside the order of the Railroad Commission dated March 3, 1928, is affirmed. That part of the judgment appealed from which determines the amount of stream-flow necessary for navigation is reversed, with directions that the record be returned to the circuit court and thence to the Railroad Commission for the making of an order in conformity with the principles laid down in this opinion.

FOWLER, J., took no part.