STATE, Appellant, vs. ADELMEYER and others, Respondents.

*January 11—April 28, 1936.*

For the appellant there were briefs by the *Attorney General, A. H. Smith,* special assistant attorney general, and *Warren H. Resh,* assistant attorney general, and oral argument by *Mr. Smith, Mr. Resh,* and *Mr. W. J. P. Aberg* of Madison.

For the respondents there was a brief by *Thompson, Myers & Helm* of Racine, *Richmond, Jackman, Wilkie & Toebaas* of Madison, *George A. Hartman* of Juneau, *B. J. Husting* and *Robert P. Pike* of Mayville, *Healy & Healy* of Beaver Dam, and *John A. Thiel* of Mayville, and oral argument by *Mr. Harold M. Wilkie, Mr. Peter J. Myers, Mr. W. L. Jackman, Mr. Hartman, Mr. Husting,* and *Mr. Pike.*

*Paul A. Hemmy, Jr.,* attorney, and *Eugene A. Clifford* of counsel, both of Juneau, for the interpleaded respondents.

The following opinion was filed March 3, 1936:

WICKHEM, J. This appeal brings to the court another chapter in the long history of litigation with reference to the Horicon marsh area.

This marsh is located largely in Dodge county but extends partially into Fond du Lac county. The main body of the marsh is about thirteen miles long from north to south and has a varying width of about one to four miles from east to west. (See accompanying map.) It appears to have been caused by some sort of glacial dyke lying athwart the Rock river in the vicinity of the city of Horicon, causing the waters of the river to spread out and to create a marsh.

The Horicon marsh was originally surveyed by government surveyors during the years 1836 and 1837. No part of Rock river north of the city of Horicon was meandered and none of the waters of the marsh were meandered or returned as navigable to the land department by the government land surveyors. By act of the territorial legislature of 1839, however, the channels of the Rock river from Horicon north to the north line of Dodge county were declared to be navigable. A short distance north of the city of Horicon, Rock river divides into an east and a west branch, the junction of these branches being in the marsh area.

By authorization of an act of the legislature, a power dam was built at Horicon about the year 1844 and rebuilt in 1848. The owners of this dam, however, did not acquire flowage rights, and in consequence of legal action on the part of landowners, this dam was removed in 1868. See *Zweig v. Horicon Iron & Mfg. Co.* 14 Wis. *357, 386. Prior to 1868, a dam was erected at Hustisford which is located about ten miles south of Horicon. This dam backed up the waters of the Rock river and created a body of water lying between Horicon and Hustisford, known as Lake Sinissippi.

In the year 1890, the Diana Shooting Club was organized and acquired hunting leases on about five thousand two hundred acres of marsh land in the southern part of Horicon marsh. Due to the removal of the dam at Horicon, there was very little water in this part of the marsh during the hunting season, and for the purpose of providing enough water so that hunters could use boats in the territory, the Diana dam was erected and had the effect of raising the water level from twenty-five to thirty inches. This structure was maintained until 1913, although in 1906 portions of the dam had been dynamited at the instance of landowners. In 1913, it was removed as an incident to drainage operations hereafter to be described.

At or before the erection of the Diana dam, another dam had been erected further north across the east branch of the

Rock river and had backed up the waters of this branch in the vicinity of Malzahn's bay. Shortly after the erection of the Diana dam, the Horicon Shooting Club, which had hunting leases further north, had difficulty navigating their hunting grounds and erected another dam across the west branch of the Rock river, which dam existed until the drainage ditches were dug. The effect of this dam was to raise the waters in the vicinity of Long Lake about twelve inches.

Beginning with 1880 and extending down to the time of the drainage operations, landowners, even with the several dams then in existence, were able to cut large quantities of hay off the Horicon marsh. This was true of the lands covered by the Diana leases. The land was in such shape that during the hunting season prairie chickens could be hunted by driving out on the marsh various distances from shore, and during these years there was no water on the surface of the ground. Beginning about 1905, a project was initiated to drain Horicon marsh, and proceedings to organize a drainage district were instituted. In 1907, a detailed survey of the marsh was made. The areas of water were indicated upon this map. The total area of water as indicated by the map was two thousand eighty and nine-tenths acres. The drainage district contemplated the removal of the dam at Horicon and the draining of back water resulting from its maintenance. The execution of this plan would have resulted in the draining and destruction of Lake Sinissippi.

Upon proceedings being instituted, this court held, in the case of *In re Horicon Drainage District,* 136 Wis. 227, 116 N. W. 12, that the project contemplated the impairment and destruction of a navigable body of water, and that no such power existed under the drainage laws in the absence of express legislative authority conferred upon the drainage commissioners in plain and unambiguous terms. It was held that while Lake Sinissippi had been artificially formed by the Hustisford dam, it must be deemed by reason of its maintenance in that condition for forty years to be a naviga-

ble body of water and beyond the power of the drainage commissioners to destroy as an incident to drainage operations. The proceedings to form a drainage district were consequently dismissed.

Thereafter, beginning with the year 1910, landowners in the region of the marsh dug a system of ditches now in existence on Horicon marsh, and pursuant to certain specifications, cleared out, deepened, and widened the channel of Rock river through the city of Horicon. These operations consisted of the digging of a main ditch beginning one mile north of the north line of Dodge county and extending southerly, and the digging of laterals wherever requested by the landowners to intercept streams flowing into the marsh from the uplands. These streams had well-defined banks before entering the marsh, but thereafter spread over the surface and became surface waters. The glacial dyke or ledge which prior to the dredging operations existed across the bed of the stream at the city of Horicon, and which probably was the principal cause of the creation of the marsh, was removed. The effect of the drainage operations and the removal of this ledge was to lower the ordinary water level of Horicon marsh about one foot, and the dredging operations facilitated and accelerated the passing of flood waters over the marsh.

In 1925, the dam at Hustisford was raised eighteen inches, and this has tended to offset the effects of the ditching operations. As a result of the ditching, however, the riparian owners and the owners of bordering land were able to cultivate their lands more effectively and the lands have since been used for pasturing, raising hay, and in several instances growing other crops requiring cultivation.

Sec. 1596—53, Stats. 1913 (enacted by ch. 755, Laws of 1913), provided:

"The improvement of the navigation of all navigable waters of this state, and the construction, maintenance, or operation of dams or other structures now or hereafter con-

structed therein for any purpose whatsoever, shall be under
the supervision of the commission [railroad commission].
. . . The commission, in the interest of navigation, other
public rights, and of the public welfare and safety, shall have
power to regulate and control the level and flow of water in
all navigable waters in this state. . . ."

This act was in force prior to and after the completion of
the dredging although it was repealed in 1915.

In 1913, certain taxpayers and residents of the cities of
Horicon and Mayville petitioned the railroad commission,
representing that the drainage project was changing the
course, lowering the level, destroying the headwaters and
navigation of Rock river, draining out the lake that forms
the headwaters of the river, destroying hunting and fishing,
and causing the river to become stagnant. After a hearing
the commission found: (1) That by reason of the drainage
work deeper water will be insured at Horicon at all times and
navigation improved; (2) that although the current may
become slow at times, no unhealthful or unsanitary condi-
tion will result; (3) that in view of benefits which will accrue
through increased farming area tributary to Mayville and
Horicon, the project is not subject to condemnation as in-
jurious to public rights or safety. As a result of these con-
clusions, the petition was dismissed.

The 1927 legislature enacted ch. 475, Laws of 1927, now
sec. 29.571, Stats., which provides as follows:

"(1) A wild life refuge, game preserve and fur farm
shall be established on the Horicon marsh in Dodge county
under the supervision of the conservation commission.
 "(2) . . .
"(3) The conservation commission shall purchase or ac-
quire by condemnation proceedings the land known as the
Horicon marsh, or as much thereof as it deems necessary,
and may construct such buildings thereon and provide such
equipment as is reasonably required to carry out the purposes
of this section.

"(4) The conservation commission is authorized to construct and maintain a dam or dams in or near the city of Horicon, to control and regulate the flood waters on Rock river, and to restore the public waters of Rock river on Horicon marsh to the natural levels existing prior to the private drainage of the same."

At the same session chs. 475 and 479, of the Laws of 1927, were enacted, the first appropriating the sum of $25,000 for the establishment of a wild-life refuge on the marsh, while the other appropriated the sum of $10,000 for the building of the dam referred to in sec. 29.571, Stats.

On April 27, 1928, the conservation commission made application to the railroad commission of the state of Wisconsin for a permit to construct the dam authorized by sec. 29.571 (4), Stats., and requested that commission to fix and determine the normal water levels of the Rock river in the Horicon marsh as they existed prior to the drainage operations. On December 20, 1928, after a hearing, the railroad commission made certain findings with reference to such water levels. The conservation commission was granted permission to—

"construct, maintain, and operate across the waters of the Rock river at any locations which they may select, all dams and other works necessary or convenient for the purpose of restoring and of maintaining the normal elevations of the Horicon marsh as found herein; that before proceeding with the work of construction plans of such dams and other works including locations shall be submitted to the railroad commission for its approval."

No action was at any time commenced to review or set aside this order, and the time for prosecuting such an action has elapsed.

Under this permit, a dam was built across Rock river at Horicon. No wild-game refuge has been lawfully established on Horicon marsh, nor has the conservation commis-

sion acquired by purchase or condemnation any lands or easements in the Horicon marsh except approximately one thousand one hundred acres of land lying south of the south line of section 25 of the township of Burnett, extending east and west across the marsh.

Upon these facts, a declaration of rights is asked under the declaratory judgment law. While the action was tried to the court upon facts that are, in general, conceded, evidence was taken upon several disputed issues of fact and findings made upon these issues. Since there is no attack upon the findings, they will be taken as verities.

It is the claim of plaintiff that the state has the right to restore and maintain the normal and natural water levels of the Horicon marsh area as they existed prior to the drainage of the marsh without incurring any liability to the owners of land in this area. This claim is founded in part upon the contention that the drainage operations were wholly unlawful, and that the proposed activities of the conservation commission are directed to the destruction of conditions illegally created and maintained, and this opinion may well begin with a consideration of the merits of the state's position in this respect.

By the terms of the territorial act heretofore referred to, Rock river was declared navigable between the city of Horicon and the northern boundary of Dodge county, and it is claimed that the ditching operations changed its channel, destroyed ponds and adjacent waters, and otherwise impaired its navigability.

It is evident that no person, whether he be a riparian owner or not, may destroy or impair navigable waters. *In re Dancy Drainage Dist.* 129 Wis. 129, 108 N. W. 202; *Attorney General ex rel. Becker v. Bay Boom W. R. & F. Co.* 172 Wis. 363, 178 N. W. 569; *Merwin v. Houghton,* 146 Wis. 398, 131 N. W. 838; *In re Horicon Drainage District,* 136 Wis. 227, 116 N. W. 12. In view of what was said in these

cases, it may seriously be questioned whether the state may abdicate its position as trustee and destroy or authorize the destruction of such waters. Be this as it may, there certainly is no prohibition against the improvement of navigable waters by the state. In *Merwin v. Houghton, supra,* it was held that the state may do whatever is necessary and appropriate to regulate and improve navigability. It was there held that a change in the channel of a stream is within this power if it improves navigability. It is true that such a change may impair the rights of riparian owners who by the change are removed from their position upon a body of water. There is no occasion to determine the rights of such riparian owners to resist the change unless compensation is given. It suffices to state that at least the only private persons having any possible right to object to a change by the state in the course of a navigable stream when such a change is beneficial to navigation are those riparian owners whose rights will be lost by the change or those whose lands will be subjected to a new servitude by reason of the new course.

It follows that if all the riparian owners, whose interests are affected by a change in the level or course of a stream, agree to the change, the state alone may object to the execution of the plan. It may well be that the state could object even if the change tended to improve navigability for the reason that no private person may usurp the powers of the state as trustee. On the other hand, if the project actually improved or did not impair navigability, there would appear to be no reason why the state might not consent or acquiesce.

While the proceedings to form a drainage district were dismissed, this was because the project was found to contemplate the destruction of navigable waters. The dismissal of these proceedings does not impress us as determinative or indeed of great importance. The emphasis placed by the state upon the fact that the proceedings to form a drainage district were found to be illegal and were dismissed, seems

to carry with it the implication that the right to conduct drainage operations is wholly dependent upon the organization of a drainage district. Sec. 1379—1, Stats. 1913, provides:

"When any owner or owners of land, lead or other mines shall desire to construct a ditch or drain from such land or mines across the land of another person and no agreement can be made for the construction thereof across such land, such owner or owners may file a petition. . . ."

The fact which makes necessary and sets in operation the drainage district law with its provisions for the organization of a *quasi*-municipal corporation having powers of assessment and condemnation is the existence of owners who are unwilling to join the project. If all of the owners of land involved in a drainage project agree to the project in all particulars, there is no occasion to form a drainage district. With respect to navigable waters within the area of a proposed drainage project, it is clear enough that neither a district organized under the drainage district law nor one operating solely by the consent of all concerned has any power to impair or destroy navigable waters. In this respect the situation is the same however the project is administered. The fact that is of vital importance in this case is that after dismissal of the proceedings to form a district, the riparian owners in conjunction with owners of bordering lands actually did dig ditches, straighten the channel, and conduct other operations with respect to Rock river above the city of Horicon. This work was authorized by an ordinance of the city of Horicon which operated as a consent by that city to so much of the project as might come within its jurisdiction. All of the persons whose rights were in any way affected by the project having acted in concert, the record discloses no landowner with standing to attack the lawfulness of the operations, and if it did, it is not apparent that the state could take advantage of this fact. Since the railroad commission, to which at that time the statute had committed the

supervision of dams and the regulation of the level and flow of the waters in all navigable waters, found that the project improved rather than impaired navigability of the river, it is difficult to see how the state is in any position to object in its own right to the lawfulness of the operations. Assuming, however, that the state has any such standing, it could only be upon the ground, (1) that the ditching impaired the navigability of the river; (2) that the determination of the commission to the contrary is not binding on the state; and (3) that if the position of the state is sound in fact, it cannot consent to a usurpation by private individuals of the trusteeship of the state in navigable waters. Assuming (2) and (3) and leaving out of consideration the determination of the railroad commission, the evidence does not establish that the drainage project did impair navigability. It is true that some of the widespreads and sloughs of the west branch of the Rock river have been drained of water and that the river channel has been straightened. This objection may be answered in the words of Mr. Justice SIEBECKER in *Merwin v. Houghton, supra:*

". . . The contention is that such a change of the river channel will in fact operate to destroy navigable lakes within the district, and the findings of fact of the trial court are assailed on this ground. We find that the trial court's findings on this subject are supported by the evidence. The spreads of the river within the district are not separate bodies of water constituting inland navigable lakes or ponds. They have no existence independent of the river. These bodies have been formed by a scooping out of the bottoms. They are parts of the river and creek channels, and must be treated as inseparably connected therewith and as parts thereof. Under such circumstances and conditions it cannot be said that the proposed improvement affects inland navigable ponds or lakes, and the trial court's findings of fact on this subject must be approved."

We find no evidence and the trial court found none to sustain the conclusion that the ditching impaired the naviga-

bility of Rock river. In view of this and of the long acquiescence by the state in the determination of the commission and in the status created by completion of the project, the state is now in no position to assert the unlawful character of the drainage. As a result of activities having the tacit if not express approval of the state and resulting in no impairment of the navigability of the river, lands have been brought into use for agricultural purposes and have been so used for twenty years or more. It would seem that what may have originated as an artificial condition by this time deserves to be treated as a natural one. The statement in *S. S. Kresge Co. v. Railroad Comm.* 204 Wis. 479, 493, 235 N. W. 4, 236 N. W. 667, that—

"since the enactment of secs. 30.01 (2) and 31.23 (1), no riparian has without the consent of the state a right to invade the bed of a navigable stream with a structure of any kind even though it be one in aid of navigation; that under the existing law state authorities cannot give a consent to an invasion of the bed of a navigable stream which consent would conclude the state if in the future it shall be necessary for the state to remove the structure in aid of navigation;
. . ."

must be limited to acts falling within the scope of these sections. Sec. 30.01 (2), Stats., prohibits the erection of a "dam, bridge or other obstruction" without the permission of the legislature. Sec. 31.23 provides penalties for the obstruction of navigable waters.

Even though the state, for the purpose of improving the navigability of Rock river above the city of Horicon, has the power to adopt such procedures as are appropriate to that end, it does not follow that the condition created by the drainage project may be ignored and the owners left uncompensated for such damage as these changes would entail. However, it is unnecessary to express an opinion upon this question since an answer completely vindicating the power of

the state would fall far short of sustaining its position in this case.

The powers conferred by sec. 29.571, Stats., are not to be exercised in execution of the state's trust with respect to navigable waters. There is no pretense that the objective of the statute or of the operations under it is the improvement of navigability or its restoration. The plainly expressed purpose of sec. 29.571 (4) is the establishment of a wild-life refuge and a public park for recreational purposes, and this will be the result of any activities carrying these purposes into effect. Such was the construction of the statute in *State ex rel. Hammann v. Levitan,* 200 Wis. 271, 228 N. W. 140, and upon this construction the constitutionality of the statute was sustained. The authority of the legislature to enact such a law was sustained under sec. 3a, art. XI, Const., which reads as follows:

"The state . . . may acquire by gift, purchase, or condemnation lands for establishing . . . parks . . . ; and after the establishment, layout, and completion of such improvements, may convey any such real estate thus acquired and not necessary for such improvements, with reservations concerning the future use and occupation of such real estate, so as to protect such public works and improvements, and their environs, and to preserve the view, appearance, light, air, and usefulness of such public works."

Presumably, the direction in the statute that the commission acquire by purchase or condemnation the lands necessary to the carrying out of statutory purposes was inserted to bring the law into harmony with sec. 3a, art. XI, Const. It has heretofore been held that a wild-game refuge may not be established on private property without compensation to the owner. *State v. Becker,* 215 Wis. 564, 255 N. W. 144.

Whatever may be the scope of the powers of the state to maintain the navigability of Rock river, and whether that power includes that of restoring the water levels of the river

for this purpose without compensation to riparian and bordering owners for consequent flowage, the state may not, for the purpose of creating a park or wild-life refuge, flow the lands of these defendants without compensation.

What has been said heretofore makes it unnecessary to consider the scope and effect of the 1928 orders of the public service commission. It is clear enough that these orders do not foreclose or even affect the rights of defendants to insist upon compensation for the flowage of their lands, and that the defendants have no standing in this action to attack the levels established by the commission.. In the exercise of its powers under ch. 30, Stats., and in compliance with the statutory directions in sec. 29.571 (4) and ch. 479, Laws of 1927, the public service commission established the elevation of the proposed dam at Horicon necessary to maintain normal water levels on Horicon marsh and gave its permission to construct this dam and maintain it at the established elevation upon the basis that navigation would not be materially obstructed by a dam so constructed and maintained. This being the scope of the commission's determination, it has no bearing upon the questions presented here.

We deem it unnecessary to enter into an elaborate discussion of the question of damages. It is evident that if defendants or any of them sustain damages as a result of the project in view, the fact and amount of these may be established in a proper action or proceeding, and that this declaration of rights must be based upon the hypothesis that damage will result rather than upon a finding applicable to each of the defendants. The most that could be found here is that some damages will probably be sustained by some or all of the defendants. Since such a finding is of no particular utility as the foundation for a declaration of rights, we prefer to leave this issue to later determinations in proper proceedings for that purpose. It suffices to state that the meas-

ure of damages in any given case will be the difference between the present value of the land and its value as affected by the execution of the proposed projects. *Esch v. Chicago, M. & St. P. R. Co.* 72 Wis. 229, 39 N. W. 129; *Nowaczyk v. Marathon County,* 205 Wis. 536, 238 N. W. 383; *Smith v. Milwaukee E. R. & L. Co.* 201 Wis. 325, 230 N. W. 44; *Fiorini v. Kenosha,* 208 Wis. 496, 243 N. W. 761.

No consideration has heretofore been given to certain questions relating to the construction of sec. 29.571, Stats. Defendants contend that this section contains a plain mandate that the conservation commission acquire by condemnation or purchase such lands and flowage rights as are necessary for the execution of the projects set forth in the section. Plaintiff contends that the section does not authorize or direct the acquisition of lands or flowage rights except where it is necessary either to own the lands or to maintain a higher water level than that designated as normal or natural. There is no material conflict between plaintiff and defendant in the matter of construction. We do not understand plaintiff to claim that the section does not authorize the purchase or condemnation of such flowage rights necessary to the project as cannot be acquired without compensation to the owners. It is rather plaintiff's position that defendants are not entitled to compensation for flowage caused by a restoration of natural water levels, and this question we have heretofore fully dealt with. In any event, we think the statute directs the commission to acquire by condemnation or purchase such lands and flowage rights as are necessary to the execution of the statutory purpose and not obtainable without the payment of compensation. While the statute may with some reason be argued to contemplate no compensation to landowners affected by restoration of natural water levels because of an assumption on the part of the legislature that lands could be flowed to this level without compen-

sation, this is not the more obvious construction. Even if it were, the other construction is a reasonable one and should be adopted to save the validity of the act.

Defendants have elaborately argued in their briefs the fact and scope of their rights to seasonal water levels, that is, to the varying levels normally maintained by a stream in a state of nature. Defendants contend that they are entitled to have such seasonal water levels maintained and to claim compensation if by reason of the maintenance of a fixed level this right is impaired. We find no occasion for an extended discussion of this matter. Defendants do not deny plaintiff's right to maintain a fixed water level if compensation for flowage is paid. We have heretofore held that defendants are entitled to the use of their lands in their present state, and that the damages for flowage will be the difference between the value of the lands before and after flowing. Seasonal water levels will only be important to the extent that they have a bearing on the present use and value of the lands. In this connection, attention is called to the fact that the judgment declares defendants to have a fixed property right in the seasonal water levels on the marsh as they existed in a state of nature prior to the digging of the drainage ditches. We see no justification for this declaration. Defendants are entitled to the lands in the state in which they exist now. To the extent that defendants by the drainage operations have altered the pre-existing physical situation, they have lost their rights to the previous conditions, whatever they were. By reason of considerations heretofore discussed, the state is in no position to disturb present conditions without condemnation or purchase. Hence, only the present condition of the land is material, and this only in connection with the *quantum* of damages.

Neither do we see any materiality to the present controversy in that portion of the judgment which declares that the state has no right to maintain a fixed water level which will

impair seasonal levels as they existed in a state of nature on Horicon marsh. No claim is made by defendants that a fixed level may not be maintained if compensation is paid for the resulting flowage. While the authority of the conservation commission with respect to the maintenance of water levels is derived solely from the provisions of sec. 29.571, Stats., and while there may be limits beyond which the commission may not go, even if compensation is paid, we fail to see how a consideration of this question would be material to the controversy between plaintiff and defendants. Further than this, all of defendants are owners of land in Horicon marsh, and whatever the limitations upon the commission's power to raise the water levels, there is no question of their right to acquire by condemnation all or any part of the lands in Horicon marsh necessary to the execution of the project in any of its phases. Thus, none of these defendants have any standing to raise the question. It follows that the judgment should be modified by striking therefrom paragraphs 4 and 5 of the declaratory portion of the judgment together with the restraining order applicable thereto.

It is suggested rather than argued that certain temporary orders directing plaintiff to open the gates of the dam and otherwise to preserve the *status quo* pending this action were void for want of jurisdiction. While we think there is no merit in this contention, the matter is of so little present importance that we shall not attempt a detailed exposition of our views.

Plaintiff contends that certain defendants, whose lands are located south of the proposed dam, were erroneously interpleaded as defendants by the court. In considering this assignment of error, we are met with the curious fact that the record discloses neither order of interpleader, nor pleadings by the alleged interpleaded defendants, nor the means of ascertaining their identity. One of the findings of fact was to the effect that the maintenance of a dam at Horicon in a

closed condition during the summer months at the level proposed by the state will cause the waters below the city of Horicon and above Hustisford to become stagnant and offensive, to the detriment of aquatic life and the damage of lower riparian owners. The judgment restrains the state of Wisconsin and the conservation commission from operating the dam at Horicon in such a manner as to interrupt the natural free flow of water of the said river. In the absence of any adequate showing in the record as to why these parties were interpleaded, we are compelled to assume that these defendants claim the right to come into this action and present their objections to the maintenance of the dam at proposed levels because of the likelihood that this operation will result in creating stagnant water below the dam.

Sec. 260.19 (1), Stats., provides as follows:

"The court may determine any controversy between the parties before it, when it can be done without prejudice to the rights of others or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, or any persons not parties to the action have such interests in the subject matter of the controversy as require them to be made parties for their due protection, the court shall order them to be brought in. . . ."

We are of the opinion that upon an application for declaratory relief against the upper riparian owners, in which it is sought to establish the right of the state to flow the upper lands without compensation, the lower riparian owners are not only not necessary to a complete determination of the controversy, but have no interest or relation whatever to it. Neither have they such interest in the subject matter of the controversy as would require them to be made parties for their own protection. There is nothing in the judgment or in the declaration of rights, which is a part of it, that in any way affects the rights of the lower riparian owners. Their rights are not dependent upon or affected by the rights of

the upper riparian owners, and we see no occasion for making them parties. Furthermore, we discover no pleadings and no actual declaration of the rights of these parties. The only matters in the record are a finding ·of fact as to the effect of the dam upon the lower riparian owners, and an injunction against interrupting the natural and free flow of the waters in the river below the dam. We think that the judgment should be modified by striking therefrom the portion containing this restraining order.

*By the Court.*—The judgment is modified as indicated in the opinion and, as so modified, is affirmed.

A motion for a rehearing was denied, without costs, on April 28, 1936.