LUNDBERG and wife, Respondents, vs. UNIVERSITY OF NOTRE DAME and another, Appellants.

*October 11, 1938—May 9, 1939.*

188

For the appellants there were briefs by *O'Melia & Kaye* of Rhinelander, attorneys, and *Harold M. Wilkie* of Madison of counsel, and oral argument by *Mr. A. J. O'Melia* and *Mr. Wilkie*.

For the respondents there were briefs by *Bird, Smith, Okoneski & Puchner* of Wausau and *F. W. Carter* of Eagle River, attorneys, and *Charles F. Smith* of Wausau of coun-

sel, and oral argument by *Mr. Charles H. Smith* and *Mr. Walter H. Bender* of Milwaukee.

The *Attorney General, Warren H. Resh,* assistant attorney general, and *A. H. Smith,* counsel for the Wisconsin Conservation Commission, were on the respondents' briefs as *amici curiæ.*

Briefs *amici curiæ* were also filed by *Walter H. Bender* of Milwaukee, by *Quarles, Spence & Quarles* and *Miller, Mack & Fairchild,* attorneys, and *J. V. Quarles* and *Leon F. Foley* of counsel, all of Milwaukee, by *A. L. Nash* of Manitowoc, and by *Richmond, Jackman, Wilkie & Toebaas* of Madison.

The following opinion was filed November 9, 1938:

WICKHEM, J.  The facts in this case are not in any material dispute. Plaintiffs own a summer resort located on Tenderfoot lake. Tenderfoot lake is located mostly in Wisconsin, but the diagonal boundary line between Michigan and Wisconsin cuts through the north portion of this lake. Plum lake is located to the north and east of Tenderfoot lake, and is for the most part located in the state of Michigan, the boundary line running through the southwest bay of the lake. The plaintiffs' property is located on the east central shore of Tenderfoot lake, just south of the state boundary line. The defendant university has large holdings contiguous to the property of plaintiffs. The property of defendant touches all of the north shore of Tenderfoot lake and all of the east shore of Tenderfoot lake north of plaintiffs' property. Defendant's property completely surrounds Plum lake, and includes all of the area between plaintiffs' property and Plum lake. Plum lake flows into Palmer lake, which is located in Wisconsin immediately south of Plum lake. Palmer lake empties into Tenderfoot lake which flows into the Ontonagon river north to Lake Superior. The trail involved in this litigation begins on Tenderfoot lake just north of plaintiffs' property and proceeds in a northeasterly direction entirely through the land of defendant University of Notre Dame, and connects

with Plum lake at a point in Michigan. This trail is about one thousand four hundred thirty feet long and about one fourth is in Wisconsin. The trail has been used to some extent by plaintiffs' employees and guests since the resort was established in 1904. On August 13, 1937, defendant University of Notre Dame, through its agent, defendant Gillen, erected a fence across the trail, blocking it.

Plaintiffs contended in the trial court that the trail in question constituted either, (1) a portage or carrying place under the provisions of art. IV of the Northwest Ordinance of 1787 and sec. 1, art. IX, of the Wisconsin constitution, or (2) a path or highway over which plaintiffs and the public have an easement by prescription. The trial court based its judgment upon the first of these contentions, to wit, that the trail was a carrying place within the meaning of the Northwest Ordinance of 1787, and open for all time to the public use. No finding was made upon plaintiffs' claim of an easement by prescription. The first question upon this appeal is whether upon the facts the trail in question is a carrying place under the provisions of the Ordinance. Art. IV of the Ordinance provides:

"The navigable waters leading into the Mississippi and the St. Lawrence, *and the carrying places between the same,* shall be common highways and forever free as well to the inhabitants of said territory, as to the citizens of the United States, and those of any other states that may be admitted into the Confederacy without any tax, impost or duty therefor."

The applicable part of sec. 1, art. IX, of the Wisconsin constitution, reads as follows:

"And the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, *and the carrying places between the same,* shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

It will be seen that art. IV of the Ordinance was copied almost verbatim in sec. 1, art. IX, Wisconsin constitution.

In the case of *Economy Light & Power Co. v. United States,* 256 U. S. 113, 120, 123, 41 Sup. Ct. 409, 65 L. Ed. 847, it was held that to the extent that the Ordinance pertained to internal affairs, it was superseded by the admission to the union of a state affected by it "on an equal footing with the original states in all respects whatever." But, it was held—

"So far as it established public rights of highways in navigable waters capable of bearing commerce from state to state, it did not regulate internal affairs alone, and was no more capable of repeal by one of the states than any other regulation of interstate commerce enacted by the congress."

From this it appears that art. IV of the Ordinance applies to and is in full force in Wisconsin, and this regardless of the inclusion or exclusion of its terms by the state constitution. This has been recognized many times in Wisconsin. *Flambeau River L. Co. v. Railroad Comm.* 204 Wis. 524, 236 N. W. 671; *In re Crawford County L. & D. Dist.* 182 Wis. 404, 409, 196 N. W. 874; *Wisconsin River Improvement Co. v. Manson,* 43 Wis. 255; *Attorney General v. Eau Claire,* 37 Wis. 400; *Wisconsin River Improvement Co. v. Lyons,* 30 Wis. 61.

In the *Crawford County Case* it was said:

"From our acceptance of the provisions referred to of the Ordinance of 1787, it follows that it is not a question of state policy as to whether or not we shall preserve inviolate our navigable waters. We are by organic law compelled so to do. *Economy L. & P. Co. v. United States,* 256 U. S. 113, 41 Sup. Ct. 409. That we have scrupulously endeavored to carry out the mandate of the organic law and of the legislative enactments quoted, the decisions of this court abundantly show. We are the trustee of the navigable waters within our borders for the benefit not only of the people of our own state but for the benefit of the people of the whole United States. And this trust we cannot diminish or abrogate by any act of our own."

The sole question to be determined here is whether the trail in question is such a carrying place as is described in art. IV of the Ordinance.

The first difficulty is to ascertain what was meant in the Ordinance by the term "carrying place." That it referred to land over which boats or their cargo could be conveniently carried where the condition of the water was such as not to permit transfer by that means is plain enough. The "carrying place," therefore, is a strip of land between or along navigable waters over which, by the process of hauling, various points in the water route may be connected into a single avenue of commerce. At this point we are met with the contention of defendant that the term "carrying place" as used in the Ordinance refers only to carrying places over watersheds. It is asserted that the Ordinance refers to navigable waters leading into the Mississippi and navigable waters leading into the St. Lawrence, and that the phrase "carrying places between the same" quite evidently refers to trails or strips of land over which goods may be hauled to avoid the difficulties of the watershed and connect these two great water systems. Otherwise, it is claimed there would be no point in putting in the terms "Mississippi and St. Lawrence;" that if "carrying places" connecting streams in the same watershed were intended to be protected, the Ordinance could have read "navigable waters and carrying places between the same." On the other side, it is contended that the sentence construction indicates that "carrying places between the same" refer to navigable waters and not to Mississippi and St. Lawrence. From the standpoint of sentence construction, there is much to be said for defendant's argument, but such a construction would seem to frustrate the plain purpose of the act. In the *Economy Case, supra,* so far as we can determine from the record, the court was dealing with a portage in the same watershed as the Chicago river, and yet the court assumes that it was a carrying place. In the case of *United States v. The Montello,* 20 Wall. 430, 87 U. S. 431, 22 L. Ed. 391, the court dealt with the question as to the navigability of the Fox river in Wisconsin. The question was raised whether the Fox river in its natural state was navigable because of the

falls, rapids, and sand bars in certain parts of the river. It was held that navigability depended on the capacity of the river in its natural state to afford a channel for useful commerce. In describing the physical situation of the Wisconsin in its relation to the Fox, the court points out that the two rivers, with the assistance of a portage or carrying place by land over the watershed, constituted a natural watercourse that had always been open from the headwaters of the Mississippi through the Wisconsin river and thence to Lake Michigan and the St. Lawrence. While the Fox river had several rapids and chutes that impaired navigation, it was said that they did not destroy or even much arrest such navigation. The stream was always used for purposes of trade and commerce, including the great fur and lead trade. The stream was navigated by long, narrow boats called "Durham" boats, seventy to one hundred feet long, twelve feet broad, drawing from two to two and one-half feet of water, propelled by poles or oars, or dragged by horses, or occasionally, in shallow water, by boatmen. At places where navigation was impossible the boat would be unloaded and a *portage made past the difficult place,* and then reloaded, and the court concluded that Durham boats were able to "navigate the entire length of Fox river *with the aid of a few portages."* The court held that the difficulties in the way of rapid navigation with the kind of boats that were customary at the time of the Ordinance did not prevent the Fox river from being declared navigable and free, because as the court says :

"These difficulties are recognized in the Ordinance of 1787 for not only were the 'navigable waters' declared free, but also the 'carrying places' between them, that is, places where boats must be partially or wholly unloaded and their cargoes carried on land to a greater or less distance."

It seems clear from this that the United States supreme court regarded all of these places along the Fox river over which goods had to be reshipped or hauled because of the

difficulties of transportation by water as "carrying places" within the Ordinance. This seems the only sensible conclusion because there would appear to be no reason for preserving the freedom of carrying places over watersheds if the carrying places over rapids in the same watershed could be so obstructed as to block the stream of commerce, and we do not believe that the definition of "carrying places" can be narrowed in the direction suggested by defendant. Hence, we conclude that the term in question refers to portages and trails in the same watershed as well as those between watersheds.

The foregoing conclusion does not, of course, make any advance toward discovery of the scope and meaning of the reference to carrying places. This involves an ascertainment of the legislative intent evidenced by art. IV of the Ordinance, and in this connection it may be useful to consider the problem with which the legislature was dealing at the time of the adoption of the Ordinance. At that time water transportation by river and lake was not merely an extremely important factor in interstate and foreign commerce but was essential to the maintenance of the great trade in furs and other products of the then nearly unsettled northwest territory. Well-established trade routes existed, and among the most important were those which linked the Mississippi with the Great Lakes and the St. Lawrence. If these routes were obstructed either physically or politically by the imposition of tolls and tariffs, the end of that profitable trade was inevitable. In order to accomplish the legislative purpose, it was necessary not merely to make provisions for the navigable waters themselves, but for such land as would by the processes of hauling render the routes continuous and practicable for commerce, for it is plain enough that the chain of commerce could be as disastrously broken at one point as at another. From this situation and from the care with which the United States supreme court in the *Montello* and *Economy Cases,*

*supra,* has examined the commercial history of the very route or water then under examination, it is evident that this history is of some importance, and it might be concluded that the terms "navigable waters" and "carrying places" should be limited to those which at the time of the Ordinance were actually parts of substantial, important commercial routes. This contention is made in a brief in support of defendant's position by *amicus curiæ.* It seems to us that the contention as thus put must be rejected on principle as too broad, and that it was rejected in the *Economy Case,* in which it is said:

"We concur in the opinion of the circuit court of appeals that a river having actual navigable capacity in its natural state and capable of carrying commerce among the states, is within the power of congress to preserve for purposes of future transportation, even though it be not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions. And we agree that the provisions of sec. 9 of the act of 1899 (30 Stat. 1151) apply to such a stream. The act in terms applies to '*any* . . . navigable river, or other navigable water of the United States;' and, without doing violence to its manifest purpose, we cannot limit its prohibition to such navigable waters as were, at the time of its passage, or now are, actually open for use. The Desplaines river, after being of practical service as a highway of commerce for a century and a half, fell into disuse, partly through changes in the course of trade or methods of navigation, or changes in its own condition, partly as the result of artificial obstructions. In consequence, it has been out of use for a hundred years; but a hundred years is a brief space in the life of a nation; improvements in the methods of water transportation or increased cost in other methods of transportation may restore the usefulness of this stream; since it is a natural interstate waterway, it is within the power of congress to improve it at the public expense; and it is not difficult to believe that many other streams are in like condition and require only the exertion of federal control to make them again important avenues of commerce among the states. If they are to be abandoned, it is for congress, not the courts, so to declare."

It does not follow, however, that the contention is entirely to be rejected or that conditions as they existed at the time of the Ordinance are wholly without importance. There is a material distinction between a carrying place and navigable waters. It is fairly to be inferred that a carrying place exists only in connection with the use of navigable waters as a commercial route. Until there is such use of the navigable waters, there is no occasion to portage and no established place over which the process of hauling is done. A navigable river or lake exists regardless of Ordinances, and so does its capabilities for navigation. Not so the carrying place, which comes into being only when commercial necessity arises and is located only by use or planning in connection with commercial navigation. Hence, it appears to us that the only carrying places which the act may be claimed specifically to refer to and preserve are those which had been located and were in use as such at the time of the enactment of the Ordinance. It cannot have been intended to deal with specifically and to preserve unlocated portages for the obvious reason that the act would have nothing to operate upon. Whether the Ordinance imposed its burdens upon particular lands then in use as carrying places we do not undertake to decide. It is intimated in *Willamette Iron Bridge Co. v. Hatch,* 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629, that carrying places may be abandoned, and in *Huse v. Glover,* 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487, that the state may in the improvement of navigation, so long as congress does not occupy the field by a law regulating the subject, substitute canals, bridges, or other structures for carrying places. Presumably, either congress or the state may change the location by any lawful means. The legislative purpose was to protect carrying places to insure continuity of commerce along waters, and not to fix permanently the location of any particular carrying place. So long, however, as an established carrying place has not been abandoned, it is within the protection of the Ordinance. To that extent only is a

burden incidentally put upon particular land. What has here-tofore been said does not mean that a new water route may not be established with its necessary portages. It is intimated in the *Economy Case, supra,* that should improvements in methods of water transportation or increased cost in other methods of transportation restore the usefulness of old water routes or establish the usefulness of new routes, congress might make the improvements necessary to their use. Where, however, it cannot be shown that a particular chain of rivers and lakes was in use as a commercial route at the time of the enactment of the Ordinance, the existence of a carrying place may not be established by merely identifying some old trail which connects these waters and which might be a con-venient portage if a commercial route were established. In such cases, when the chain of waters becomes useful as a route for commercial purposes if supplemented by portages, it is necessary to acquire by gift, purchase, or condemnation the land necessary to the portages. Once purchased or other-wise acquired, such land doubtless becomes a carrying place, and until abandoned either by the federal government or the state in the exercise of their powers to improve navigation, it is protected by the provisions of the Ordinance from ob-struction or political interference. It is our conclusion, there-fore, that assuming the Ordinance to have imposed some sort of servitude upon property then used for carrying places, it did not and could not do this with respect to land lying between waters which did not then constitute a part of some established commercial route. If carrying places are to come into existence in connection with such waters, they must be acquired by the process of purchase, condemnation, or other such means.

This conclusion determines the issue adversely to plain-tiffs. There is no evidence whatever that at the time of the Ordinance Plum or Tenderfoot lakes taken in connection with the Ontonagon river constituted a trade route to Lake

Superior or that these waters had any commercial use as a water highway. There is indeed no evidence that they now have any substantial commercial use. In view of the distinction between navigable waters and carrying places, it becomes unnecessary to discuss apparently conflicting definitions of navigability in Wisconsin, Michigan, and under the federal rule.

In the case of *Leovy v. United States,* 177 U. S. 621, 632, 20 Sup. Ct. 797, 44 L. Ed. 914, it was said:

"It is a safe inference from these and other cases to the same effect which might be cited, that the term, 'navigable waters of the United States,' has reference to commerce of a substantial and permanent character to be conducted thereon."

See also *United States v. The Montello, supra; Oklahoma v. Texas,* 258 U. S. 574, 42 Sup. Ct. 406, 66 L. Ed. 771; *United States v. Oregon,* 295 U. S. 1, 55 Sup. Ct. 610, 79 L. Ed. 1267.

By this standard Plum lake is not navigable, and the trail connecting it to Tenderfoot lake does not connect navigable waters. Treating the Ontonagon river, Tenderfoot, Palmer, and Plum lakes as some sort of a chain, the latter is the last link of the chain. It is, so far as the evidence discloses, nothing but a small, landlocked, spring-fed lake, which discharges its waters by seepage and is in no substantial sense connected with, or a part of, a transportation route, or even of a chain of lakes and rivers. It has had no substantial commercial use either alone or in connection with other lakes. We conclude that the trial court was in error in finding that the trail in question was a carrying place under the Ordinance. In disposing of this contention, we have assumed, without deciding, that the physical obstruction of established carrying places by private persons is within the prohibition of the Ordinance.

It is next contended that plaintiffs have established in themselves and in the public an easement by prescription. Since

this issue was not determined by the trial court, it can only be determined here if upon the evidence it may be disposed of as a question of law. The evidence of plaintiffs is to the effect that the trail was well defined and used by resort guests and the public generally for the twenty-eight years that plaintiffs' resort has been in operation, and that brush has been removed from the trail by plaintiffs during this period. There was other evidence to the effect that this trail was in existence as early as 1876, and that the blazes upon the trees were then twenty-five to thirty years old. There was testimony that railroads and organizations have shown this trail on their maps and advertising folders. The evidence of the former owner of the land is that as far back as 1907 he knew the use by the public of portage trails over his premises and never objected to their general use. The lands involved were not patented until 1889. At that time defendant's predecessor in title purchased the lands without reservations of any kind. It is conceded that the lands were wild, uninclosed timber lands. Upon these facts, it is clear to us that plaintiffs, as a matter of law, failed to establish a prescription by adverse user. The doctrine of *Bassett v. Soelle,* 186 Wis. 53, 57, 202 N. W. 164, and *State v. Town Board,* 192 Wis. 186, 195, 212 N. W. 249, clearly apply to the facts and determine the matter adversely to plaintiffs. In the *Bassett Case* it was said:

"It is a matter of common knowledge that where there is uninclosed woodland, like that here in question, it is customary for the public, for purposes of pleasure or convenience, to pass through it without express permission. So long as such use causes no inconvenience to the owner he would be regarded as unneighborly and churlish to forbid the use. In some parts of this state there are large areas of open woodland through which many persons pass without restraint. These lands are held by the owners with the expectation that when it is practicable they will inclose and cultivate them. It would be a harsh rule that the owners of such lands must stand guard over them or be deprived of valuable

rights by those who have taken advantage of liberal treatment. It is for such reasons as these that it is generally held that the mere use of a passway through woodland will not give a right of way by prescription."

In the *Town Board Case* it was said:

"It is not necessary to penalize a considerate owner who has permitted travel over his uninclosed lands in order that the neighborhood may have highways. The town authorities are clothed with power to lay out highways wherever public necessity requires."

To the same effect, see *Wiesner v. Jaeger,* 175 Wis. 281, 184 N. W. 1038; *Kolpack v. Kolpack,* 128 Wis. 169, 107 N. W. 457.

Applying the doctrine of these cases, it is evident that the use now claimed to be adverse was permissive at the outset. There could have been no adverse possession or adverse user prior to 1889 when the patent was issued, and since that time it is evident that the owners without any objection whatever permitted people generally to use this trail.

It was, of course, pointed out in the case of *Shepard v. Gilbert,* 212 Wis. 1, 6, 7, 249 N. W. 54, that the "fact of permission by an owner to an adverse user is important, not so much as an independent fact, but rather in the light that it throws upon the character of the user." The court went on to state that,—

"If, however, the user, whether at the outset or later, proposes to hold not under the permission given but adversely, and makes this intention manifest to the owner, the permission is not effective to destroy the adverse character of the use."

We discover nothing in the evidence to indicate that there was at any time brought home to the owner of these premises notice of an intention to use the premises under claim of right rather than under the permission. The mere removal of brush from the trail is so inconsequential in its probative

tendencies as to be disregarded. The advertisement by the railroad and other organizations through maps showing this as a trail and inviting the patronage of the public is not an unequivocal repudiation of the permission or probative of an adverse claim. Even if it were so treated, it is not shown that notice of this claim was brought home to the owner in such a way as to make the doctrine of the *Shepard Case, supra,* applicable.

The case of *Haase v. Kingston Co-operative Creamery Asso.* 212 Wis. 585, 588, 589, 250 N. W. 444, is cited to the effect that "where the owner of land creates an artificial body of water upon his own premises, he may permit the public to enjoy the ordinary use of such waters, and, it may be, that by the lapse of time such enjoyment will ripen into a dedication which he will not be permitted to destroy." This statement in the *Haase Case* was not necessary to its determination and does not even state in positive terms any doctrine of law. It was merely used as a hypothetical introduction to the doctrine of the case, which is stated in the following sentence:

"But such a use of the waters does not amount to an adverse possession in favor of the state giving the state title to the land under the waters, and, so far as previous decisions to the contrary are concerned, they are hereby overruled."

It is clear enough that there was no purpose in the *Haase Case* to overrule or modify the doctrine of the *Bassett, Town Board,* or *Shepard Cases.*

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiffs' complaint.

FAIRCHILD, J., dissents.

The following opinion was filed May 9, 1939:

WICKHEM, J. (*on motion for rehearing*). Due to the importance of the question involved, its novelty, and the dearth of authority directly in point, the court has considered

it advisable to restudy the entire matter. This study has raised in our minds no question as to the soundness of the original disposition of the case, but it leaves us in some doubt whether we did not take too conservative a position in the original opinion. At the time the case was originally submitted, there was a serious question in our minds whether under any circumstances the Northwest Ordinance, (1) dealt with or prohibited physical obstructions to navigable waters or carrying places, (2) created any rights whatever in individuals to seek redress for such obstructions, or (3) located carrying places or imposed a servitude upon any particular land for such purposes. This was founded upon statements in a number of cases to the effect that the purpose of the act was solely to prevent the imposition by states of duties and tariffs for the use of navigable waters and carrying places within their limits, thus discriminating against the rights of travel by nonresidents and interfering with the flow of interstate commerce. In the case of *Willamette Iron Bridge Co. v. Hatch,* 125 U. S. 1, 5, 8 Sup. Ct. 811, 31 L. Ed. 629, referring to an act of congress admitting the state of Oregon to the Union and declaring that "all the navigable waters of the said state shall be common highways, and forever free, as well to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, impost, or toll therefor," the court said (p. 12) :

"It seems clear, therefore, that according to the construction given by this court to the clause in the act of congress relied upon by the court below, it does not refer to physical obstructions,—but to political regulations which would hamper the freedom of commerce."

The court intimates that while the congress might if it saw fit assume the care of navigable streams, the states have the plenary power until it acts fully to control them and to authorize obstructions of them in the exercise of the police power.

In *Cardwell v. American Bridge Co.* 113 U. S. 205, 5 Sup. Ct. 423, 28 L. Ed. 959, the court asserts, (1) the control of congress over navigable waters to preserve their free navigation under the commerce clause, (2) the power of the states within which they lie to authorize construction of bridges over them until congress intervenes and supersedes their authority, and (3) rejects the right of private parties to interfere with the construction or continuance of such bridges. The court construes the statute admitting California into the Union containing provisions similar to those involved in the *Willamette Bridge Case.* The import of this provision is held to be similar to that contained in the Ordinance of 1787. The purpose is thus stated:

"Namely, to insure a highway equally open to all without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of any toll for their navigation; and that the clause contemplated no other restriction upon the power of the state in authorizing the construction of bridges over them whenever such construction would promote the convenience of the public."

In the case of *In re Southern Wisconsin Power Co.* 140 Wis. 245, 260, 122 N. W. 801, this court said with reference to sec. 1, art. IV of the Northwest Ordinance that the decisions of the United States supreme court,—

"Establish the following propositions: . . .

"(e) The clause in the constitution providing that the navigable waters therein referred to 'shall be common highways and forever free,' etc., does not refer to physical obstructions of these waters, but refers to political regulations which would hamper the freedom of commerce."

In *Keator Lumber Co. v. St. Croix Boom Corp.* 72 Wis. 62, 38 N. W. 529, as well as in the *Southern Wisconsin Power Co. Case,* the *Willamette Case, supra,* is quoted and followed. We consider that these authorities reasonably support the contention that the Ordinance of 1787 had a far

more limited scope than was indicated in the original opinion, namely, that the act was wholly political in its prohibitions, leaving to the exercise of the state police power and enactments by congress, if made, such prohibition of physical obstructions to navigation or physical interferences with navigable waters as might be considered compatible with the public welfare. All of the cases cited deal with the power of states in the course of making public improvements of various sorts physically to interfere with navigable waters (and impliedly carrying places). Statements of the court, however, that the Northwest Ordinance has nothing whatever to do with physical obstructions are broad enough to support the conclusion that it does not prohibit such obstructions by private parties any more than it does by states, and that it creates no rights in private persons to object to such acts. The statement in the *Cardwell Case, supra,* that the purpose of the act is to insure a highway equally open to all without preference to any and unobstructed by duties or tolls and "thus prevent the use of the navigable streams by private parties to the exclusion of the public" is the only expression casting some doubt upon this conclusion. In view of this statement and of the fact that in none of these cases was the general doctrine directed at precisely the situation involved here, we took the relatively conservative ground that even assuming that the act prohibited physical obstructions or interferences with navigable waters or carrying places, it could only relate to then existing and established carrying places, and that carrying places do not exist merely by ascertaining the peculiar utility of the land for the purposes of portage but by use or acquisition for such purposes. From this position we are not disposed to recede. Obviously, the materiality of the conclusion depends upon the assumption that the act does prohibit physical obstructions by private persons and that it vests private persons injured by such obstructions with a cause of action therefor. However, it necessarily follows from the

assumption. Rejection of the assumption can only be upon the rule of the cases heretofore discussed that only political interference with navigable waters was within the scope of the Northwest Ordinance, and this rule, if adopted, is quite as fatal to respondents' appeal as was the original conclusion of the court. Since it is within the competency of the congress to assume the care of navigable waters, to prohibit their obstruction, and to vest in private persons a cause of action to prevent such obstructions, the enactment of such a law would bring into full materiality the original rule of the case. An act prohibiting interference by private persons with carrying places and creating a cause of action in private persons for such an act would assume the existence of such places rather than establish them. A plaintiff would be required to prove that the portage was established before or after the act by purchase, condemnation, prescription, or dedication in order to come within its protection. Since the original reasons given are effective to dispose of this litigation upon assumptions most favorable to plaintiffs, and since we regard the conclusions based upon these assumptions to be correct, we do not deem it necessary finally to determine whether the Northwest Ordinance has any relation whatever to physical obstructions by private persons or whether it is effective to create causes of action in private persons for such obstructions. On the other hand, we do not wish to foreclose a later holding to this effect, and for that reason find it necessary to file this explanatory memorandum.

The motion for a rehearing is denied, with $25 costs.